# RICHARDSON'S EXECUTOR *v.* GREEN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE WESTERN DISTRICT OF MICHIGAN.

No. 19. Argued October 17, 18, 1889. — Decided January 13, 1890.

While the relations of a party towards a corporation, as a director and
officer, or as its principal stockholder, do not preclude him from entering
into contracts with it, from making loans to it, and from taking its bonds
as collateral security, a court of equity will refuse to lend its aid to their
enforcement unless satisfied that the transaction was entered into in
good faith, with a view to the benefit of the company as well as of its
creditors, and not solely with a view to his own benefit.

In the case of a corporation, as in that of a natural person, any conveyance
of its property, without authority of law, in fraud of its creditors, is
void as to them.

The capital stock of a corporation, when it becomes insolvent, is, in law,
part of its assets, to be appropriated to the payment of its debts, and if
any part of it has been issued without being fully paid up, a court of
equity may require it to be paid up.

R. loaned to a railroad company $100,000 upon its notes, and received from
it 1250 shares of paid-up stock as a bonus, and 200 mortgage bonds of
the company, and the practical control of the board of directors of the
corporation. After this he demanded of this board 100 more bonds, as
further collateral, and they agreed to it. Subsequently he proposed
to the board that he would make further advances if they would put 300
more bonds in his hands as collateral, and they assented to this proposal;
but he never made such further advances. These 400 bonds, together
with other bonds and property of the company, then came into his hands
at a time when he was acting as and claiming to be the treasurer of the
company. After the insolvency of the company took place, R. claimed
to hold these 400 bonds individually, as collateral for his debt; *Held,*
that, as between him and the other creditors of the company, he could
not, under the circumstances, hold them as collateral for his debt.

At the last term of court motions to dismiss *Nelson* v. *Green* and *Nelson
et al.* v. *Green* were argued at the same time with a motion to dismiss
this case, and the motion was granted as to those cases, and denied as to
this case. After the entry of judgment counsel in those cases moved on
behalf of the appellants that the sum of $450 which had been deposited
with the clerk for copies of the record should be refunded; *Held,* (the
judgment being announced in delivering the opinion and announcing the
judgment in this case,) that $200 of that amount should be refunded.

IN EQUITY. The previous proceedings in this case on a
motion to dismiss are reported in *Richardson* v. *Green,* 130

·U. S. 104. The case now made, at the hearing on the merits, is stated in the opinion.

*Mr. Lyman D. Norris* for appellants.

*Mr. Daniel P. Hays* for Sickles and Stevens, appellees.

*Mr. T. J. O'Brien* for Sickles, Stevens and the Wrought Iron Bridge Company, appellees.

*Mr. J. Hubley Ashton,* (with whom was *Mr. Henry M. Dechert* and *Mr. Henry T. Dechert* on the brief,) for Bower & Co. and Betz, appellees.

*Mr. D. A. McKnight* for Thomas W. Ferry, Edward P. Ferry and Nims, appellees.

MR. JUSTICE LAMAR delivered the opinion of the court.

This is a suit in equity, originally brought in the Circuit Court of the United States for the Western District of Michigan by Ashbel Green and William Bond, trustees, against the Chicago, Saginaw and Canada Railroad Company, a corporation organized under the laws of the State of Michigan, to foreclose a mortgage given by that company on all its property and effects of whatsoever description to the plaintiffs, to secure the payment of 5500 of its bonds of $1000 each, payable to said trustees or bearer.

The suit was commenced on the 16th of November, 1876. A receiver was at once appointed. The company made no defence, but numerous parties, holders of the bonds thus secured, and others with claims of various kinds against the company, with leave of the court, intervened in the case, and were allowed to prove their respective claims. The controversy resolved itself into a contest for priority among the respective claimants in the distribution of the proceeds of the sale of the mortgaged property thereafter to be made.

On the 30th of June, 1882, a decree was rendered that the bill was well filed, and that the complainants were entitled to

a foreclosure. The matter was referred to a master to take testimony and report upon the validity, and also the priority, of the various claims filed. On the 6th of November, 1882, the master filed his report, in which he divided the claims presented into four classes, numbered A, B, C and D, respectively. In class C he placed the claims secured by the first mortgage bonds, and the amount of said security. In this class was the claim of Benjamin Richardson for money furnished to aid in the construction of the road, amounting, with interest, to $273,282.87, secured, as the master found, by 200 bonds, amounting to $374,904. Exceptions to this report were filed by nearly all of the parties interested, but, in the main, it was confirmed by the court, and, on the 3d of May, 1883, a decree was entered on the question of priority among the respective claimants in the distribution of the fund arising from the sale of the mortgaged property, which had occurred. This decree, among other things, provided that, after certain expenses and certificates given by the receiver had been paid, the remainder of the fund should be ratably divided among the bond claimants, and where the bonds were held as collateral security no greater amount should be allowed than sufficient to satisfy the debt thus secured.

Benjamin Richardson's claim is in this class. It was for 600 bonds claimed as collateral security for the amount of money advanced by him for the construction of the road, and for 1105 other bonds which he alleged he had redeemed from certain bankers in London; and, in another form, was for 3574 bonds which he had purchased at an execution sale in New York City that was had to satisfy a judgment he had obtained against the railroad company in the Court of Common Pleas for the city and county of New York for the amount of his debt with interest. The decree allowed Richardson's claim as respects 200 of the 600 bonds, but rejected it as to the other bonds claimed by him.

Subsequently, that decree was amended by the decree of October 8, 1883, so as to correct certain mistakes in the calculation of interest upon the bonds. The effect of this latter decree was to reduce Richardson's share of the proceeds by

$2173.91 from what the original decree of May 3, 1883, had made it; and also to reduce in like manner the share of one of the other intervening parties, the Wrought Iron Bridge Company of Canton, Ohio, by the sum of $183.60.

Four separate appeals were taken from the decree of May 3, 1883, and an appeal was also taken by Richardson and his assignee, Henry Day, from the amended decree of October 8, 1883. At the last term of the court all the appeals were dismissed except that of Richardson and Day from the decree of October 8, 1883. *Richardson* v. *Green*, 130 U. S. 104. Before the decision at the last term of the court was rendered Richardson died, and his legal representatives are now prosecuting the appeal. As a decision upon the questions presented by this appeal affects the distribution decreed by the court below of $137,154.94 among the other claimants, it becomes necessary to examine the facts and to give consideration to the equities which relate to the claims of all those parties.

The Chicago, Saginaw and Canada Railroad Company was organized about the 4th of December, 1872, under an act of the Michigan legislature approved April 18, 1871, with a capital stock of $4,200,000, divided into 4200 shares, for the purpose of building a railroad from St. Clair, in the eastern part of the State, to Grand Haven, on Lake Michigan, a distance of about 210 miles.

The original incorporators each subscribed for 210 shares of this capital stock, five per cent of which was paid in. This was all the stock ever subscribed, and all the money paid in on any stock. Nine of those corporators were elected directors, all but three of whom resigned in 1873, transferring their stock, it is supposed, to those three. The stock subscribed and the money paid on it may, for all practical purposes, be considered as having afterwards disappeared from the organization.

For the purpose of raising funds to build the road and equip it the corporation executed a mortgage and issued 5500 seven per cent bonds of $1000 each, due in 30 years, with interest payable semi-annually, and placed them in the hands of its executive committee to be put upon the market. Before selling any of its bonds, however, the corporation borrowed con-

siderable money from various parties, giving the bonds as security, at the rate of two dollars in bonds for every dollar borrowed, and also giving, as a bonus, to the parties from whom the money was borrowed, a large amount of capital stock.

These loans were negotiated with the following persons: (1) With a syndicate of four persons in Philadelphia, designated in the record as the "Philadelphia parties," who advanced money to the company on the terms above stated until the amount aggregated, according to the report of the master, $143,629.62. The number of bonds pledged to the syndicate, as collateral security for this loan, was 462. The Philadelphia parties claimed before the court below to be entitled to prove all the bonds held by them to the full amount of principal and accrued interest, and to a share in the proceeds of the fund derived from the sale of the mortgaged property to the extent of their loans and the interest thereon. The decree of the court allowed their claim, to the extent of 287.26 bonds only, that number being twice the amount of the principal advanced. The second party from whom the company obtained a loan was the appellant Richardson, upon terms hereinafter stated. The third party was George G. Sickles of New York, who loaned the company $100,000 upon a pledge of 250 of the bonds, as collateral, and also a bonus of $100,000 full paid stock. Afterwards his son, Daniel E. Sickles, bought 163 of the bonds for the consideration that he would assume and pay the debt due his father, which he afterwards did. The bonds held by the elder Sickles were then returned to the company. Daniel E. Sickles claimed that, as an innocent purchaser, he was entitled to priority over the other collateral bondholders, who were the directors, officers and promoters of the company. His demand for priority was disallowed by the court; and the only part of his claim that was allowed was, that as innocent purchaser of the 163 bonds he might prove them to the full amount of his principal and interest.

After the negotiation for the three loans above named, Thomas M. Nelson contracted with the company to ballast and iron the first twenty miles of the road from the town of

St. Louis west, etc. This contract he substantially performed. Two months afterwards he entered into another contract with the company to clear, grub and grade the road, and build bridges and culverts on the second division thereof to Lakeview. Part of this second contract was assigned to the claimant Soule. This contract also, with the exception of a part of the grading, was performed by these parties. They had no security for the payment of their services. They relied on the solvency of the company and the assurances of Richardson, who was then a director and the treasurer of it, that arrangements were perfected for the payment of the work as fast as it progressed. The company failed to pay the amount due on these contracts. Suits were brought, judgments obtained, and executions issued which were returned *nulla bona.* They presented their claims to the master, who reported in their favor, and allowed them priority over the bondholders to the amount of $16,342.68. Exceptions to this finding having been filed were sustained by the court below, which allowed their debt, but put it in the fourth class, to be paid *pro rata* from any surplus remaining after the bondholders were paid.

The claim of the Wrought Iron Bridge Company was based upon a contract with the railroad company, under which it built an iron bridge across the Saginaw River, which was sold by the receiver for the sum of $20,000. This claimant was allowed a share in the proceeds of the sale on the basis of the 66 bonds of which it had become the actual owner.

The claim of Stevens was based upon a *bona fide* loan made to the company by him. By the decree of the court below he was allowed a share in the funds to the extent of 32 bonds.

Any modification of the decree of the court below favorable to the contention of the appellants herein will correspondingly reduce the allowances made to the above-mentioned claimants.

The loan of $100,000 by Richardson to the railroad company, on which he obtained the first 200 bonds, as collateral, was made by him on the 31st of March, 1875, under a contract with the company, in which he agreed to lend the corporation that amount upon certain terms, which, among others, were, (1) that the company should deliver to him 200 mortgage

bonds of $1000 each; (2) that, within fourteen days, he should be elected a director of the company; (3) that John A. Elwell, of New York City, should be employed by the company at a salary of $2500 and his personal expenses, for the purpose of superintending the construction of the road and of looking after the interests of Richardson; (4) that as a further collateral security the company should lease the first 20 miles of the road as soon as it should be completed, and assign such lease to Richardson, and should also assign to him all the subsidy notes pertaining to that division of the road, he to retain all the money derived from the lease and subsidy notes, and render unto the company, at final settlement, seven per cent interest upon the money so received; and (5) that the company should execute and deliver to Richardson 1250 full paid shares of capital stock of $100 each. Although, on its face, this was to be fully paid up stock, it was understood that no money was to be actually paid for it, the consideration, as recited in the agreement, being Richardson's services, good offices and influence in favor of the company in the financial world.

In the contest for priority among the claimants before the master the judgment creditors of the corporation claimed that they entered into the contracts with the company whereon they obtained their judgments relying upon its resources, which they were led to think were ample by reason of the amount of the outstanding paid up stock in the hands of such responsible stockholders and owners as Richardson and the Philadelphia parties; and it was contended that those stockholders should not be allowed to share in the proceeds arising from the sale of the mortgaged property on the basis of the bonds held by them, as collateral, unless they should first pay to the company the full amount of the shares of stock of which they had held themselves out to the world as the owners. The master concurred in this view, but, because there was no proof of the actual value of the stock, he declined to make any deduction from the amount due to Richardson, but limited his claim to the 200 bonds. The appellants received the amount which the decree allowed, but appealed to this court from that decree, contending that they were entitled to a

larger share of the fund on the basis of the additional 400 bonds.

To determine the merits of the contention of the appellants, a somewhat minute statement of the circumstances which led the board of directors to vote to Richardson those 400 additional bonds becomes necessary. The 1250 shares of paid up stock for which he paid nothing made him the largest stockholder in the company. He and the Philadelphia parties held all the outstanding stock with the exception of a few shares, and the entire and absolute control of the corporation was thus in their hands. Richardson soon controlled a majority of the board, and dominated its proceedings. He was at once made a director, according to the contract. He became chairman of its executive committee and its managing director. The lease of the first 20 miles of the road was made to him, and that part was turned over to his possession. He had John A. Elwell, his coadjutor and representative, elected a director, who became, successively, secretary, auditor and a member of the executive committee of the board. He afterwards caused Ambrose, Hamm and Cooper to be put upon the board of directors, to each of whom he assigned small portions of his stock to enable them to vote in furtherance of his schemes and interests ; and the 1250 shares of paid up stock were in due time issued to him.

At a meeting of the board of directors, held on the 5th of July, 1875, although he had advanced nothing beyond his original loan already secured, he demanded 100 additional bonds, representing $100,000, as collateral, and the board, yielding to his exactions, unanimously adopted a resolution directing the secretary and treasurer to deposit with him that number of bonds for such purpose. Within one month afterwards, to wit, August 5, 1875, Richardson was unanimously elected treasurer of the company, to fill the vacancy caused by the resignation of E. P. Ferry, which he had tendered, to take effect when his accounts should be adjusted by the executive committee, and when the personal obligations he had made should be settled, or he be relieved therefrom. The board of directors also voted to Richardson 300 additional first mort-

gage bonds as collateral. How he accomplished these results, to wit, the resignation of Ferry, his own election as Ferry's successor, and also the vote to himself of the 300 bonds, is very fully explained by the testimony of the directors and of Richardson himself. Ferry thus states why he resigned: "Mr. Richardson said to me that he thought that, advancing as much money as he did, he not only should have all the moneys of the company in his hands, as treasurer, to see that they were properly disbursed, but also the securities of the company under his control." In explanation of his tendering his resignation, to take effect upon being settled with and relieved from personal responsibility, he says: "I had endorsed the company's notes to the amount of about $20,000, and furnished them with money, both. I had advanced the company, as treasurer, from my own funds, in the neighborhood of $10,000. I think it was $9000 and something." He further stated that Mr. Richardson assured him that the adjustment and release asked for should be effected. He also stated that Richardson had never performed those promises. The vote of 300 bonds to Richardson is thus explained by himself: "I demanded of the board 300 more bonds, and got them by resolution of the board." The resolution directed a conveyance to Richardson of 300 of the first mortgage bonds of the company upon the consideration of advances made and to be made by him. The fact is, that the sum actually advanced by him in addition to his original loan, for which these 400 bonds were successively voted to him, amounted to a little over $31,000. The terms upon which he made the demand for these additional bonds are stated by Ferry and Elwell. At this same meeting, held August 3, 1875, Richardson introduced the following resolution:

"*Resolved,* That the president and secretary be, and they are hereby, authorized to execute a contract for the purpose of grading, tying and bridging the company's located road from its western terminus to Lakeview."

Elwell testifies that Richardson stated to the board that if they would, by resolution, authorize him to receive 300 additional bonds of the company of $1000 each, he would make

further advances to a sufficient amount for the company to go on with the extension and equipment of the road to Lakeview. It was in consideration of these promised advances that the resolution was adopted directing the 300 bonds to be conveyed to him. This promise was never fulfilled by Richardson. Elwell testifies that he advanced no money for the extension or equipment of the road to Lakeview, nor did he purchase any iron or other material to be used on that part of the road. Both Richardson and Ferry, according to their own testimony, considered that the action of the board of directors placed Richardson, as treasurer, in the shoes of Ferry, at least with regard to the custody of the unissued bonds of the company. These bonds, 2985 in number, were deposited with a Safe Deposit Company in New York City, subject to the control of Ferry. Ferry immediately drew an order on that company authorizing it to deliver to Richardson all the bonds belonging to the railroad company deposited with it, and, through Elwell, gave to Richardson the key to the vault in which they were kept, in order that he (Richardson) might take possession of them. Armed with this order to the Trust Company to deliver the bonds to him, as treasurer, Richardson, on the 20th of August, 1875, in company with Messrs. O. W. Child and M. J. Baney, proceeded to the place of business of the Trust Company, and, his order having been accepted by that company, took possession of all the unissued bonds there belonging to the railroad company, Messrs. Child and Baney counting them and making a memorandum of them. This memorandum of the number counted included the 400 now claimed by the appellants, as collateral security. On the following day, Richardson, claiming to act under the authority of the aforesaid resolutions of the board of directors voting the 400 bonds to him as collateral security, and the order of the president of the company to Ferry, separated 400 of the bonds from the remainder, (Child and Baney assisting him,) and placed them in a tin box, which he afterwards kept in his personal possession.

On the 11th of October, 1875, Richardson was appointed managing director, irrevocable, and chairman of the executive

committee; and, on the 12th of the same month, he gave to Ferry the following receipt:

"Received of Edward P. Ferry, treasurer of the Chicago, Saginaw & Canada Railroad Co., twenty-two hundred and eighty-nine (2289) of the first-mortgage bonds of the company, numbered as detailed by the memorandum above, dated New York, Aug. 20, '75, and signed by O. W. Child & M. J. Baney, placed in my custody as chairman of the executive committee of said R. R. Co., in accordance with the resolution of the board of directors passed Oct. 11, '75, for custody, disposal, or sale.

" BENJAMIN RICHARDSON.

"Endorsed: Benjamin Richardson. Receipt — 2289 bonds. Oct. 12, 1875."

The list thus receipted for by Richardson as chairman of the executive committee, included the 400 bonds numbered from 3201 to 3600, inclusive, which he previously, as before stated, had separated from the original number, and claimed had been pledged to him as collateral security. It is safe to say, too, we think, that no one interested in the affairs of the company, except Elwell and Richardson, knew, at that time, that Richardson was holding those 400 bonds in any other capacity than as treasurer of the company. Elwell testified that at the meeting of October 11, 1875, none of the other parties knew that Richardson had those bonds.

W. J. Kelley testified that, at a meeting of the board of directors on that day, the understanding of the board derived from Richardson's statement was, that he had in his possession only the original 200 bonds as collateral. Secured in the possession of the company's bonds, Richardson refused to comply with the conditions on which Ferry had resigned. On the 16th of August, 1875, Elwell enclosed in a letter to Richardson two renewal notes to be substituted for those on which Ferry had been endorser, saying: " Mr. Ferry demands that, before he resigns his office of treasurer and turns everything over to you, you shall endorse the renewal notes person-

ally, as he did the original ones, and it is for that purpose that I send them, and they ought to be returned to Mr. Ferry immediately, so as to reach him the last of this week, to be used in the bank next Monday. . . . Mr. Ferry gave me one of his envelopes stamped, in which you had better enclose the notes to him. . . . Mr. Ferry has agreed to turn over to you or to deliver to me for you on your order all books, accounts, vouchers, etc., in his possession as treasurer upon the two notes being returned to him endorsed." Richardson remonstrated with Elwell against this, and on the 21st of the same month he replied to Elwell's next letter, declining to sign the notes, and declaring himself indifferent to Elwell's retention of the books and papers pertaining to the office of treasurer, inasmuch as he (Richardson) had already become not only the treasurer, but also the receiver, advancer and chief controller of the company. On that day the board of directors voted 120 bonds to Richardson as a bonus. Counsel for the appellants insist in their brief that this was done in his absence, and that he repudiated this resolution and refused to take those bonds. This statement is in conflict with that of Kelley, president of the company, who testifies that Mr. Richardson was present, and, so far from objecting to the vote of the bonus to him of 120 bonds, he insisted upon it; but as they make no claim on these bonds as a bonus, it is not necessary to add anything further, except the remark that the action of the board illustrates the readiness of the directors to subserve all Richardson's wishes.

At the meeting of July 8, 1876, the board, in anticipation of the foreclosure of the mortgage then determined on, passed resolutions auditing the entire account of Richardson against the company, and declared the sum of $185,584.18 to be due to him from it. Another resolution, unanimously adopted, ratified and approved the bonds issued to him for that aggregate sum. A third resolution was adopted directing the secretary to execute and deliver to him the notes of the company at seven per cent, payable at such times as could be agreed on with Richardson, and that there should be embodied in the note an authority to the holder, in default of payment, to sell such

bonds without notice and with the right to become himself the purchaser if sold at public sale. On the same day, immediately after the meeting, Elwell, the secretary, gave to Richardson those notes, in which were recited the numbers of the 600 bonds under discussion. On the same day, Richardson and Ferry addressed to the mortgage trustees a written request to institute proceedings to foreclose the mortgage. These notes, on the 17th of July, at the request of Richardson, were torn up by Elwell, and demand notes, bearing the same date, substituted therefor. Forthwith Richardson commenced suit against the corporation in the Court of Common Pleas of the city of New York on those notes; and on the 12th of August obtained the judgment hereinbefore mentioned. Execution was issued on that judgment, and, as the proofs clearly show, the sheriff levied upon and sold all the bonds of the company which had been placed in Richardson's custody, namely, the 600 bonds which he claimed had been pledged to him as aforesaid, and 2974 other bonds, including 1105 which he claimed to have redeemed from a bank in London. At the sale Richardson purchased all those bonds at the price of $50 each, $178,700. A short time after this sale and purchase, to wit, November 16, 1876, this suit for foreclosure was commenced, and as an intervener therein he claimed that by virtue of his purchase at the sheriff's sale he became the absolute owner of the entire 3574 bonds. Afterwards he appears to have confined his claim to the 600 bonds alleged to have been held by him originally as collateral security and the 1105 bonds just referred to. It would seem from the briefs filed in this court by counsel on behalf of appellants that the claim here is confined to the 400 bonds above described.

In view of all the facts and circumstances presented by this record we are unable to see any such superior equity arising out of the transactions of Richardson with this company as entitles him to a priority over the other creditors in the distribution of the fund in question; or anything in his mode of getting possession of the 400 bonds which gives him a better claim to them than that of the other creditors. While we may not be prepared to concur with the master in some of the rea-

sons upon which he based his report, yet we do not think either that report or the decree of the court below confirming it contains any error of which the appellants can complain.

Richardson's relation to the subject matter of this controversy was threefold: (1) That of a creditor of an insolvent corporation claiming for his debt priority of payment over those of all other creditors, out of the fund arising from a foreclosure sale of the mortgaged property; (2) that of a director and officer of that corporation at the time his debt against it was created; and (3) that of the largest shareholder of its capital stock. Undoubtedly his relation as a director and officer, or as a stockholder of the company, does not preclude him from entering into contracts with it, making loans to it and taking its bonds as collateral security; but courts of equity regard such personal transactions of a party in either of these positions not, perhaps, with distrust, but with a large measure of watchful care; and unless satisfied by the proof that the transaction was entered into in good faith, with a view to the benefit of the company as well as of its creditors, and not solely with a view to his own benefit, they refuse to lend their aid to its enforcement. In *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587, 588, Mr. Justice Miller, delivering the opinion of the court, said: "That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others."

In relation to the rights and liabilities of a stockholder, this court said in *Sawyer* v. *Hoag*, 17 Wall. 610, 620, Mr. Justice Miller also delivering the opinion of the court: "We think it now well established that the capital stock of a corporation, especially its unpaid subscriptions, is a trust fund for the benefit of the general creditors of the corporation." Proceeding to show that this trust cannot be defeated by a simulated payment of the stock subscription, nor by any device short of

an actual payment in good faith, he concluded with these words: "It is, therefore, but just that, when the interest of the public or of strangers dealing wnh this corporation is to be affected by any transaction between the stockholders who own the corporation and the corporation itself, such transaction should be subject to a rigid scrutiny, and if found to be infected with anything unfair towards such third person, calculated to injure him, or designed intentionally and inequitably to screen the stockholder from loss at the expense of the general creditor, it should be disregarded or annulled so far as it may inequitably affect him."

In the case last cited the stockholder nominally paid the stock subscription, but the money was immediately taken back as a loan, and it was claimed by him as a valid payment. The transaction was characterized by the court as a "fraud upon the public who were expected to deal with them."

In *Graham* v. *Railroad Co.*, 102 U. S. 148, 161, this court said, Mr. Justice Bradley delivering the opinion: "When a corporation becomes insolvent, it is so far civilly dead, that its property may be administered as a trust-fund for the benefit of its stockholders and creditors. A court of equity, at the instance of the proper parties, will then make those funds trust-funds, which, in other circumstances, are as much the absolute property of the corporation as any man's property is his."

In the more recent case of *Wabash, St. Louis & Pacific Railway Co.* v. *Ham*, 114 U. S. 587, 594, it was said by this court, speaking through Mr. Justice Gray: "The property of a corporation is doubtless a trust fund for the payment of its debts, in the sense that when the corporation is lawfully dissolved and all its business wound up, or when it is insolvent, all its creditors are entitled in equity to have their debts paid out of the corporate property before any distribution thereof among the stockholders. It is also true, in the case of a corporation, as in that of a natural person, that any conveyance of property of the debtor, without authority of law, and in fraud of existing creditors, is void as against them."

Can the transactions between Richardson and the insolvent

corporation of which he was largely the owner and controller, especially with respect to the claim he is urging in this case, stand the test of the fairness and good faith which, as a director and stockholder, he owed to the corporation, its creditors and *bona fide* bondholders? His very first transaction with the corporation, by which he introduced himself into it as a stockholder, was an illegal and fraudulent act. We refer to the agreement on the part of the company to issue to Richardson 1250 shares of bonus stock. At the time this agreement was made and the stock issued in pursuance thereof, the statutes of Michigan provided: " That it shall not be lawful for any railroad company, existing by virtue of the laws of this State, nor for any officer of any such company, to sell, dispose of, or pledge any shares in the capital stock of such company, nor to issue certificates of shares in the capital stock of such company until the shares so sold, disposed of, or pledged, and the shares for which such certificates are to be issued shall have been fully paid." 2 Comp. Laws Mich. par. 7757.

We have seen that all the acts of Richardson as director, stockholder, chairman of the executive committee and treasurer, all of which offices he held at one time, had their origin in this bonus stock. After having exercised all the privileges and powers of a stockholder in the corporation, it cannot be seriously contended that he is to be held exempt from the liabilities which would attach to a *bona fide* shareholder who has taken shares purporting to be paid up, but which in truth are not paid up. The case of *Scovill* v. *Thayer*, 105 U. S. 143, 153, 154, bears a close analogy to this. Mr. Justice Woods delivering the opinion of the court in that case said: " The stock held by the defendant was evidenced by certificates of full-paid shares. It is conceded to have been the contract between him and the company that he should never be called upon to pay any further assessments upon it. . . . But the doctrine of this court is, that such a contract, though binding on the company, is a fraud in law on its creditors, which they can set aside; that when their rights intervene and their claims are to be satisfied, the stockholders can be

required to pay their stock in full." The same rule is laid down in *Ex parte Daniell*, 1 DeG. & J. 372. In that case the directors of the company allotted to themselves a number of shares by a resolution that the shares so allotted were to be treated as paid up stock in full. Daniell, one of the directors, was not present at the time the resolution was adopted, but he afterwards accepted the shares allotted to him. An order having been made for winding up the company, assessments were made upon those shares for the purpose, it is supposed, of paying the debts of the company. It was held that Daniell was liable to those assessments to the same extent as if the resolution had not provided that the shares were to be treated as paid up stock.

The principle underlying all of the decisions which we have cited upon this point is, that the capital stock of a corporation, when it becomes insolvent, is in law assets of the corporation, to be appropriated to the payment of its debts; and that creditors have the right to assume that the stock issued by the corporation and held by its stockholders as paid up stock had been paid up, or, if unpaid, that a court of equity, at the instance of the proper parties, could require it to be paid up. In the case now before us, the bonds claimed by the appellants were voted to Richardson by his associate directors, every one of whom owed his election to the holders of this bonus stock alone. The total amount of the advances made by him, for which these bonds are collateral, is very little larger than one-half of the amount of the stock which he had as paid up stock. If the stock given to him and the Philadelphia parties had been really paid up stock, there would have been no insolvency on the part of this corporation.

Irrespective of the question whether he can be made liable for the face amount of this stock, or for its proved value, the facts we have detailed certainly do not entitle his claim to outrank that of any *bona fide* creditor, whether secured or unsecured, in the matter of distribution.

The master found that the 400 bonds had never been delivered by the company to Richardson in his individual capacity, in pledge as collateral security for the moneys advanced. It

is strenuously argued in behalf of appellants that the evidence taken under the order of the court, after the findings of the master had been made and his report filed, for the purpose of explaining the receipt given by Richardson to his predecessor, Ferry, is sufficient to overturn the master's report on that point. That evidence was before the court when it rendered the decree complained of, and, so far as the decree shows, it was not regarded as essentially modifying the facts as found by the master. We think the conclusion of the court was correct. We do not deny that cases may arise in which, if everything were admitted to be fairly done, with the knowledge and acquiescence of the company, such a personal possession as that which Richardson obtained, although not such an actual delivery as the board had intended and directed, might be considered as equivalent to a legal delivery. But under the special circumstances of this case, in view of the unfair means employed by Richardson to have the entire body of the company's bonds transferred from the custody of Ferry into his own custody, and the clandestine manner in which he took out the 400 from that body, not only without notice of the fact to the company, but with an implied, if not an expressed, denial of the transactions, we do not think that he can be regarded as standing in the position of a legal and equitable pledgee; or that he ever acquired, as such pledgee, a lien on the 400 bonds. But even if there could be any doubt on this point, Richardson himself by his own act has removed it. He waived and abandoned all claim to any lien, as a pledgee, by his voluntary surrender and delivery of the bonds to the sheriff of the county of New York, as the property of the company, to be sold under execution. If the 400 bonds were not delivered to Richardson, as we think the court below correctly held, it follows that the unissued bonds were not subject to attachment or to execution as valid and binding obligations against the company, and that Richardson's purchase at the sheriff's sale vested in him no title or ownership in them.

Counsel for the appellants in their brief put not a little stress upon the fact that Richardson's claim is based upon the

advance of actual money for the enterprise to the full amount of $185,584.18. The answer to this is, that the decree of the court below recognized his claim to the entire amount and gave him his ratable share of the proceeds of the sale, upon the footing of the 200 bonds delivered to him, up to the amount of $273,282.87. We are of the opinion that that decree gave him the fullest measure of allowance to which he could possibly be justly entitled.

It is hardly necessary to say much with respect to the claim of Richardson to the 1105 bonds alleged by him to have been redeemed as aforesaid. Upon this question the master says:

"The case is briefly this: The board of directors sent one of their number as financial agent to Europe with authority to negotiate a sale of bonds. While there, to defray expenses, he borrowed a sum of money from a Mr. Stevens and pledged to him 50 of the bonds as collateral security; these, together with the 1105 bonds, this agent and Stevens deposited with the Consolidated Bank of London, with agreement that the bonds should not be delivered to any one without the joint order or consent of the agent and Stevens. The agent was withdrawn from Europe; the indebtedness due Stevens was allowed to go to protest, and the directors were fearful Stevens would not only sell the bonds pledged, but would also sell the 1105, and the purchaser obtain title to the whole, and thus render nearly valueless the securities held by the directors. To prevent this calamity Richardson advanced the money, charged it to the company, and received its notes therefor. He then attempted to do what he was fearful might have been done in London, namely, levy upon and sell the 1105 bonds, and himself become the purchaser at a nominal sum, and thus gain an unconscionable advantage over other bondholders. It is a general rule that fraud or any gross misconduct on the part of the salvors in connection with the property saved will work a forfeiture of the salvage, and the evidence in this case with reference to the means employed to obtain a levy on the bonds in question and the sale thereof fully justifies us in the conclusion which I have reached that no allowance ought to be made to Richardson by way of 'equitable salvage' for the

moneys advanced by him to obtain the return of the bonds to the company."

We fully agree with what is said by the master, and do not deem it essential to add anything further on that point.

As regards the decree of October 8, 1883, we think it sufficient to say that the corrections made by it, as regards the calculations of interest on the bonds, in the original decree were correct and proper, and were warranted by the law. The original decree had allowed interest on some of the bonds owned and held as collateral security from the date of their issue. The amendatory decree simply allowed such interest to be calculated from the date when the bonds were actually delivered to the owners and holders of them. Such correction was eminently legal and just.

*The decree of the court below is affirmed.*

---

NELSON *et al. v.* GREEN. NELSON *v.* GREEN. Appeals from the Circuit Court of the United States for the Western District of Michigan. Nos. 947 and 1027 of October term, 1888.

These cases were heard with *Richardson* v. *Green* on the motions to dismiss at the last term of court, and are reported with it in 130 U. S. 104. After the announcement of the judgment on the motions on the 13th of March, 1889, *Mr. William A. McKenney,* on behalf of Nelson, on the 22d of April, 1889, moved to have four hundred and fifty dollars refunded, which Nelson had been obliged to deposit with the clerk. After announcing the foregoing opinion and judgment,

MR. JUSTICE LAMAR delivered the opinion of the court on this motion.

In connection with this case a motion has been made by Thomas M. Nelson, one of the intervening petitioners in the suit, whose appeals were dismissed at the last term of the court, to have refunded to him the sum of $450 deposited with the clerk under the order of this court of January 14, 1889, requiring such deposit to be made in order that his counsel might have two printed copies of the record.

This motion is based upon the following grounds:

(1) That the petitioner was not one of the principal litigants in the appeals, but was simply an intervening judgment creditor, having no interest in the matter of the controversy between the bondholders and the trustees;

(2) That his demand is quite small when compared with the amount involved in the controversy between the principal litigants; and

(3) That he was not a necessary party to the determination of the questions involved in the controversy between the main parties to the litigation, but simply intervened as the only manner in which he could protect his rights under his judgment against the company for work and labor performed for it in the construction of the road.

*The motion is granted to the extent of $200.*