In re TRI–O–CLEAN, INC. a/k/a, 03 Tech, Inc., 59–3006369, Debtor.

Patricia Dzikowski, Trustee, Plaintiff,

v.

Tri–O–Clean Systems, Inc. f/k/a Tri–O–Clean Laundry Systems, Inc., Manuel Caldera d/b/a The Caldera Company and Amex Financial Services, Inc., and Lanston E. Eldred, Esq., Defendants.

Bankruptcy No. 97–32811–BKC–PGH.
Adversary No. 97–0901–BKC–PGH–A.

United States Bankruptcy Court,
S.D. Florida,
Fort Lauderdale Division.

Sept. 29, 1998.

**194**

John L. Walsh, Dzikowski & Walsh, Fort Lauderdale, FL.

John O. Hopkins, Boca Raton, FL.

Lantson E. Eldred, Indian Wells, CA.

Manuel Caldera, The Caldera Company, Indian Wells, CA.

Frederic J Di Spigna, Boca Raton, FL, for Debtor.

Patricia Dzikowski, Lauderhill, FL, trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAUL G. HYMAN, Jr., Bankruptcy Judge.

This trial of this adversary proceeding commenced before the Court on October 21, 1997. Upon the Defendants' ore tenus request, the trial was continued to allow the Defendants to produce additional witnesses and evidence. The second day of trial was held on June 12, 1998. Patricia Dzikowski, the duly appointed Chapter 7 Trustee (the "Trustee") filed a Complaint to Determine Validity, Priority and Extent of Lien, for Turnover of Property of the Bankruptcy Estate, and Injunctive Relief on September 4, 1997. The Complaint sought to determine

the validity, priority and extent of a lien claimed by AMEX Financial Services, Inc., the imposition of a permanent injunction enjoining the Defendants from exercising control over property of the estate, and for turnover of all of the Debtor's books and records and stock certificates,[1] under 11 U.S.C. § 542. The Court having considered the evidence presented, the candor and demeanor of the witnesses and the arguments of counsel, hereby enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable hereto by Rule 7052 of the Bankruptcy Rules.

## FINDINGS OF FACT

Tri–O–Clean, Inc. (the "Debtor") filed a voluntary petition under Chapter 7 of Title 11, United States Code, on June 10, 1997. The Defendant, Tri–O–Clean Laundry Systems, Inc. a/k/a Tri–O–Clean Systems, Inc., ("Systems") is a Florida corporation partially owned by the Debtor, and uses the same business address as the Debtor. Systems manufactures and markets a commercial laundry system using an ozone water cleaning technology. The Debtor owns 2,387,500 shares of stock in Systems (the "Systems Stock") which it acquired in exchange for a transfer of rights to some portion of the patented ozone water cleaning system.

AMEX Financial Services, Inc. ("AMEX"), is owned and controlled by Manuel Caldera. The Caldera Company is a California sole proprietorship of Manuel Caldera. Lanston E. Eldred, Esq. ("Eldred"), is an officer of Systems. Eldred also personally serves as the attorney for AMEX, for the Caldera Company, and for Manuel Caldera (collectively the "Caldera Entities").

Pursuant to an agreement dated May 14, 1993 (the "Management Agreement"), the Caldera Company, agreed to operate and provide management services and financing to the Debtor and Systems. The Caldera Company also assumed all responsibilities for

---

1. The stock certificates which were the subject of Count II of the Complaint were turned over to the Trustee pursuant to Court Order dated September 5, 1997, with delivery thereof subject to any claims, liens, or encumbrances. Thus, the Trustee's claim for turnover of the stock certificates is moot and will not be addressed further.

daily management of all operational facets of the Debtor and Systems, including, but not limited to, control of budgeting, accounting and finance, marketing, sales, personnel, plant and administration. The Management Agreement also granted Manuel Caldera irrevocable proxies to vote the Systems Stock on all matters at any and all meetings during the time the agreement was in place. Pursuant to an extension of the Management Agreement, dated May 30, 1995, the Management Agreement was extended to May 31, 1997. No further extensions were entered into and the agreement expired by its own terms, on May 31, 1997.

The only business which the Debtor conducted after entering into the Management Agreement was to sell certain laundry system distributorships and marketing rights to Manuel Caldera and International Ecoscience, Inc., a corporation owned by Manuel Caldera and his family. The only other business which the Debtor had conducted since 1992 was the sale and repurchase of three regional distributorships which allowed the purchasers to market the ozone water cleaning systems. The sale and production of the laundry systems which employ the patented ozone laundry cleaning technology was and continues to be conducted by Systems.

The Systems Stock is the only major asset of the Debtor available for liquidation or disposition by the Trustee for the benefit of creditors. AMEX is the largest scheduled creditor of the Debtor and claims a secured interest in the Systems Stock to the extent of Two Million and ⁰⁰/₁₀₀ ($2,000,000.00) Dollars. The security interest is memorialized in a stock pledge agreement and assignment of stock between the Debtor and AMEX dated February 1, 1996 in which the Debtor granted AMEX a security interest in the Systems Stock.

On September 18, 1995, the IRS levied upon the Systems Stock for $82,171.77 representing a debt owed to the IRS because of the Debtor's failure to pay its 1992 payroll taxes. The Debtor received a Certificate of Release of Federal Tax lien in the amount of $60,638 on May 26, 1995. AMEX paid the IRS the monies for the release of its federal tax lien.

Pursuant to a September 23, 1993 Order Granting Temporary Injunction from the Circuit Court of the Nineteenth Judicial Circuit in and for Port St. Lucie County, Florida, the Debtor, the Caldera Company, Manual Caldera, Systems, and AMEX, amongst others, were enjoined from withdrawing, transferring, pledging, assigning, conveying, or otherwise disposing of any shares of either the Debtor's or Systems' Stock. The Temporary Injunction was the result of a dispute between the plaintiff, John B. Gallo, and various defendants including the Debtor, the Caldera Company, Manuel Caldera, Systems, and AMEX over the rights of the plaintiff to an interest in the patent of the ozone water cleaning technology. On November 30, 1995, an Order Amending the Temporary Injunction was entered. As a result of the Amended Temporary Injunction, the Debtor and Systems placed 1,930,000 shares of Systems' stock in escrow pending the determination of Gallo's claim. The Amended Injunction specifically provided that the Systems was taken out of the operation of the Temporary Injunction. Thus, the Temporary Injunction did not prohibit the Debtor from granting a security interest in the Systems Stock to AMEX.

Archie Garcia ("Garcia") was the in-house accountant for the Caldera Entities responsible for their financial transactions with the Debtor. Garcia had been employed by the Caldera Entities for several years. Garcia left his employment with the Caldera Entities post petition but continued to do consulting work for these entities. Garcia testified as to the manner in which funds were transferred from AMEX to the Debtor, the manner in which funds were transferred to the Debtor, and the account to which the funds were transferred. He also testified as to the procedure used in making disbursements from the Debtor's accounts, the Debtor's business operations during the period the Caldera Company served as management company for the Debtor, and the types of documentation which were maintained and required by the Caldera Company in managing the Debtor's business. The documentation clearly reflects the receipt of funds by the Debtor. However, the evidence at trial

failed to show the specific disbursement of these funds by the Caldera Company on the Debtor's behalf. Manuel Caldera and Garcia testified generally that the loans were used to pay business expenses of the Debtor's ongoing business operations, existing indebtedness, outstanding taxes, and payroll taxes. A letter dated January 18, 1996, from the Debtor to Manuel Caldera specifically states that AMEX will pay the monies owed to the IRS for the Debtor's 1992 payroll taxes.

Caldera testified that his knowledge of the transactions was limited to general overall knowledge of the relationship with the Debtor and Systems and that the Caldera Company provided management services to the Debtor, while AMEX provided financing to the Debtor. He indicated that Garcia was responsible for the operational aspects of the management. Caldera repeatedly stated in his deposition and at the trial that Garcia would be able to produce the documentation which accounted for the receipt and disbursement of all funds by the Debtor during the period the Caldera Company served under the Management Agreement. However, no such documentation was produced.

Charles Pearsall, President of the Debtor, and currently an officer in Systems, testified that AMEX provided all of the funding required by the Debtor and Systems subsequent to the Caldera Company becoming the management company for the Debtor. However, other than corroborating Garcia's testimony as to the procedures in place for managing the Debtor's business and the types of documentation which should detail the Debtor's business transactions, Pearsall had no personal knowledge of the financial transactions since the Debtor's finances were managed from the Caldera Company's offices in California.

All of the witnesses called by the Defendants portrayed the records of the Debtor and Systems as having been in a state of disarray prior to the Caldera Company taking over the management of the Debtor. There had been little or no attention paid to corporate formalities or to distinguishing between the Debtor and Systems.

The exhibits introduced at trial attempted to show that AMEX provided loans to the Debtor in exchange for a security interest in the Systems Stock. The loans from AMEX to the Debtor were evidenced by the following transactions. The Debtor had an Optional Advance Credit Line with AMEX in which funds were disbursed from May 13, 1993 until November 18, 1994. The loan balance on the Optional Advance Credit Line balance was $945,899.19 on June 1, 1997. The evidence also showed a replacement promissory note for $530,000 entered into between the Debtor and AMEX on November 19, 1992. The balance due on the promissory note was $943,527 on June 1, 1996. The exhibits also showed a Promissory Note for $84,649.48 secured by a pledge in corporate stock entered into between the Debtor and AMEX on April 23, 1996. Thus, AMEX loaned the Debtor approximately $1,974,075.67 through these three loan transactions. The exhibits also reflect that AMEX caused to be recorded a UCC–1 financing statement on the Systems Stock. A detailed composite exhibit of bank records and tax statements clearly reflects that the funds loaned to the Debtor from AMEX were deposited into the Debtor's bank accounts. AMEX and the Debtor also entered into the following agreements on February 1, 1996 regarding security in the Systems Stock: (1) a stock pledge agreement; (2) a security agreement; and (3) an assignment of stock.

In her complaint, the Trustee asserts that the Defendants have provided insufficient evidence to prove that AMEX transferred approximately 2 million dollars to the Debtor. The Trustee maintains that even if the Debtor can show the receipt of the 2 million dollars, they are unable to provide sufficient information as to how the funds were disbursed and/or used as part of the Debtor's business operations, and whether the funds were repaid to AMEX. Alternatively, the Trustee argues that the funds were used on behalf of Systems, and not the Debtor, and thus AMEX benefitted from the loans. The Trustee also argues that because AMEX is an insider of the Debtor under 11 U.S.C. § 101(31)(B)(iii), the burden of proof shifted to the Defendants to prove, under a strict scrutiny standard, that the transactions were bona-fide and conducted in good faith.

AMEX claims a security interest in the Systems stock owned by the Debtor. AMEX asserts that its security interest is properly perfected and enforceable through physical possession of the stock certificates and through recordation of a California UCC–1 Financing Statement. AMEX also asserts that it loaned the Debtor the approximate amount of Two Million and $^{00}/_{100}$ ($2,000,-000.00) Dollars, and that these loans constituted consideration for the security interest in the Systems Stock.

### CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a), and Federal Rule of Bankruptcy Procedure 7001 et seq. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### VALIDITY, PRIORITY AND EXTENT OF LIEN

The Trustee brought this claim to determine the validity, priority, or extent of a lien pursuant to Bankruptcy Rule 7001(2). This issue is governed by Florida Statutes §§ 678.313(1)(a) [2] and 678.321.[3] *See* Fla.Stat. §§ 678.313 and 678.321 (1997).

■■■■ Under Florida law, a security interest in stock is enforceable and can attach only if the security is transferred to the secured party or its designee pursuant to Florida Statutes § 678.313(1). A security transferred pursuant to an agreement by a transferor who has rights in the security to a transferee who has given value is a perfected security interest. *See* Fla.Stat. § 678.321(2). Although such a security interest is subject

to the provisions of chapter 679, no filing is required to perfect the security agreement. *See* Fla.Stat. §§ 678.321(3)(a) and 679.302(1)(f); *First Bank of Immokalee v. Rogers NK Seed Co.*, 637 So.2d 11 (Fla.2d DCA 1994) (citing *Finizio v. Shubow*, 557 So.2d 640 (Fla.4th DCA 1990)). Therefore, the fact that AMEX has a recorded UCC–1 California financing statement for the Systems Stock is not relevant to whether they have an enforceable security interest. Thus, under Florida law, the Court must determine: (1) whether the security interest in the Systems Stock was perfected by AMEX's taking physical possession of the stock certificates, and (2) whether the Debtor and AMEX had an agreement whereby AMEX gave value for the security interest in the Systems Stock.

The evidence and testimony presented by the Defendants reflects that AMEX and the Debtor entered into a financing agreement whereby AMEX provided financing to the Debtor through an optional line of credit and several other loans evidenced by promissory notes. Both the exhibits introduced at trial and the testimony clearly shows several promissory notes, and amendments thereto and stock pledge agreements were executed between the Debtor and AMEX.

The evidence clearly shows that $1,974,-075.67 dollars were disbursed to the Debtor. The funds were wire-transferred from AMEX into the Debtor's accounts. These transfers commenced at or about the time the Debtor and the Caldera Company entered into the Management Agreement. Because the evidence and testimony clearly re-

---

**2.** Florida Statute § 678.313 provides, in relevant part, as follows:

(1) Transfer of a security or a limited interest (including a security interest) therein to a purchaser occurs only:

(a) At the time the purchaser or a person designated by her or him acquires possession of a certificated security.

**3.** Florida Statute § 678.321 provides, in relevant part, as follows:

(1) A security interest in a security is enforceable and can attach only if it is transferred to the secured party or a person designated by him or her pursuant to a provision of § 678.313(1).

(2) A security interest so transferred pursuant to agreement by a transferor who has rights in

the security to a transferee who has given value is a perfected security interest, but a security interest that has been transferred solely under § 678.313(1)(i) becomes unperfected after 21 days unless, within that time, the requirements for transfer under any other provision of § 678.313(1) are satisfied.

(3) A security interest in a security is subject to the provisions of chapter 679, but:

(a) No filing is required to perfect the security interest; and

(b) No written agreement signed by the debtor is necessary to make the security interest enforceable, except as otherwise provided in § 678.313(1)(h), (i), or (j).

flects that funds were transferred from AMEX's account to the Debtor's account, the Court finds that the approximately 2 million dollars loaned to the Debtor constituted value within the meaning of Florida Statutes § 678.321(2), thereby demonstrating that AMEX gave valid consideration for its security interest in the Systems Stock.

The evidence also clearly reflects that AMEX, the secured party, had possession of the stock certificates. Eldred testified at trial and during his deposition that he personally prepared, on behalf of AMEX, a promissory note, a stock pledge agreement, and a collateral agreement referencing the transactions. Eldred further testified that he received physical possession of the Systems Stock certificates. Eldred testified that he maintained physical possession of the certificates, on behalf of AMEX, until he delivered them to the Trustee pursuant to this Court's Order.

The Trustee asserts two alternative theories: (1) that Eldred only had possession of the Systems Stock pursuant to the Temporary Injunction, and (2) that Eldred only had possession of the Systems Stock as an agent under the Management Agreement for Caldera, and not necessarily as an agent for AMEX. There is no evidence to support either theory. Eldred testified that he had possession of the Systems Stock to perfect AMEX's security interest therein.

 The Trustee raises the issue that because AMEX is an insider of the Debtor, its transactions with the Debtor must be subjected to strict scrutiny. *See* 11 U.S.C. § 101(31)(B)(iii). The United States Supreme Court in the leading case of *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939) established the principle of "strict scrutiny" when considering the claims of insiders against a Debtor. When the claim of an insider is challenged, the burden is on the insider not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. *See id.* Claims alleged by insiders "are allowable when honest and 'bona fide', but the bona fides must be demonstrated beyond cavil and examined with a large measure of

watchful care." *See In re Intermodal Freight Forwarding, Inc.*, No. 73–B–1242, 1980 Bankr.LEXIS 4360, *7 (Bankr.S.D.N.Y. Oct. 3, 1980), citing *Richardson's Executor v. Green (Washburn v. Green)*, 133 U.S. 30, 10 S.Ct. 280, 33 L.Ed. 516 (1889).

In *Pepper*, the Court found that the insider set up a one-man corporation as a device for the escape of personal liability. *See id.* at 248. The Court stated that the case illustrates the frequent use of the fiction of a corporate entity, whereby the owner of the corporation, through his complete control over it, undertakes to gather to himself all of the corporation's assets to the exclusion of its creditors. *See id.* at 247. In finding that the insider took a series of connected steps in a general plan designed to defeat creditors, the Court disallowed the insider's claim altogether. *See id.* at 248.

The Trustee also cites *Estes v. N & D Properties Inc. (In re N & D Properties Inc.)*, 799 F.2d 726 (11th Cir.1986) and *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977) to show that the burden of proof shifted to AMEX. In these cases, the Eleventh Circuit provided that equitable considerations can justify only the subordination of claims, not their disallowance; this was a more permissive position than that espoused by the Supreme Court in *Pepper*. In *N & D Properties*, the Eleventh Circuit found that an insider had acted inequitably and, instead of disallowing the insider's claim, the court subordinated it to the consumer and trade creditors claims. In *Mobile Steel*, the court equitably subordinated the claims only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the insider's inequitable conduct. *See In re Mobile Steel*, 563 F.2d at 700. There, the trustee alleged that the insider's debentures were really only preferred stock and not entitled to debt treatment. *See id.* at 701.

 The Eleventh Circuit's allocation of the burdens of proof and sufficiency are as follows. Where the claimant is an insider or a fiduciary, the trustee bears the burden of presenting material evidence of unfair conduct. Once the trustee meets this burden,

the claimant then must prove the fairness of his or her transactions with the debtor or the claim will be subordinated. *See id.* at 731. If the claimant is not an insider or fiduciary, however, the trustee must prove more egregious conduct such as fraud or overreaching, and prove it with particularity. *See id.* (citing *In re Multiponics,* 622 F.2d 709, 714 (5th Cir.1980)). Proof allocations in this Circuit provide a proper balance of burdens, assuring that the trustee does not under prove his objections while assuring that the fiduciary need not over prove his good faith and fairness at the mere cry of inequity by the trustee. *See In re Multiponics,* 622 F.2d 709, 714 (5th Cir.1980).

Ultimately, in *N & D Properties,* when the burden shifted to the insider, she could not prove the fairness of her transactions. The claimant was a controlling shareholder in the corporation and knew that the debtor corporation was in a financial crisis, that customers were being deceived, and that suppliers had cut-off shipments. Despite this knowledge, the claimant took no steps to stop advertising, to close the store, or to segregate deposits, but instead made every effort to encumber all of the corporation's assets and obtain a priority in the impending bankruptcy proceeding. Similarly, in *Intermodal Freight Forwarding, Inc.,* claims for capital contributions of insiders were subordinated; the court stated that it was not willing to allow the claims because doing so would reward the insiders for their unwillingness to assume the ordinary financial risks of contributing adequate capital at or close to the inception of a business. Likewise, in *Multiponics,* the court found that insiders engaged in an overall pattern of self interest and stated that under the Deep Rock Doctrine, a stockholder's loans to his company will be treated as capital contribution when a corporation is deemed undercapitalized.

■ In the case at bar, the Trustee seeks a determination of the amount of the validity, priority and extent of AMEX's lien. The Trustee has met her burden of presenting material evidence that the claimant has engaged in inequitable conduct. Recognizing that all of the loans to the Debtor were deposited into the Debtor's bank account, the Trustee sought some sort of explanation as to how the funds were spent in light of the fact that the Debtor's business operations were extremely limited during the time it received the loans. When the burden shifted to the Defendants, none of them were able to account for where the approximately 2 million dollars was spent except for general comments that the money was spent on legal fees, preexisting debts, and payroll taxes. The Defendants did not present a single piece of documentary evidence explaining the disbursement of the $1,974,075.67 dollars in loans by the Debtor, except for AMEX's payment of the Debtor's 1992 payroll taxes. The Defendants were unable to show that the monies were not spent running the business operations of Systems. Normally, a secured creditor does not have to provide any explanation for the whereabouts of the disbursements of its secured loans. However, AMEX is owned by Manuel Caldera who also owns the Caldera Company. The Caldera Company performed the day to day management duties of the Debtor including the maintenance of the books and records which would evidence how the Debtor spent the proceeds of the loan. Based upon the lack of documentation showing how the proceeds of the loans were expended, the Defendants have failed to meet their burden of proving that the transactions were executed in good faith. The Defendants have also failed to show that the loans were not used to run the business operations of Systems. The Court therefore finds, based upon the Defendants' failure to meet their burden of proof, that AMEX possesses an unsecured claim in the amount of $1,974,075.67.

### TURNOVER OF BOOKS AND RECORDS

■ Pursuant to 11 U.S.C. § 541, the books and records of the Debtor are property of the bankruptcy estate. Pursuant to 11 U.S.C. § 542(e), the Court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, related to the Debtor's property or financial affairs, to turnover or disclose such recorded information to the Trustee. Pursuant to 11 U.S.C. § 543, a custodian shall turnover property of the estate to the Trustee. The Caldera Com-

pany was in possession of the books and records of the Debtor as a result of the Management Agreement entered into in May of 1993. The Trustee maintains that all of the Debtor's books and records have not been turned over to the Trustee. The Defendants, specifically Archie Garcia, Manuel Caldera, and Charles Pearsall, testified that all of the Debtor's books and records including, but not limited to, all financial statements, canceled checks, ledgers, and documentation related to the Debtor's business affairs, have been turned over or should have been turned over.

The Court finds that the Trustee is entitled to turnover of all property of the estate pursuant to 11 U.S.C. § 542(e) and § 543. To the extent any books and records or other property of the Debtor is in the possession, or comes into the possession, of the Defendants or third parties under the control or direction of the Defendants, these books and records are to be turned over to the Trustee immediately.

### *PERMANENT INJUNCTION*

■■■ Pursuant to the evidence and testimony at trial, Plaintiff met her burden of proving the requisite elements required for a permanent injunction. A party seeking an injunction under Florida law must demonstrate the following: (1) irreparable harm, (2) a clear legal right, (3) an inadequate remedy at law, and (4) consideration of the public interest. *See Finkelstein v. Southeast Bank, N.A.,* 490 So.2d 976, 980 (Fla.4th DCA 1986). Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing carries the burden of persuasion. *See Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir.1985). Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant. *See id.* Here, the Court finds that AMEX's lien is unsecured and that its claim is a general unsecured claim. Accordingly, the requisite elements for a permanent injunction are met. The Trustee has a clear legal right to the Systems Stock free and clear of AMEX's alleged lien. The Trustee would suffer irreparable injury if the Defen-

dants were not enjoined from exercising control over the Systems Stock. There is no other adequate remedy at law other than issuing the injunction and allowing the Trustee to administer the assets of the estate. Finally, it is in the public interest that a Trustee be able to exercise control over the assets of the estate. Accordingly, the Plaintiff's request for the entry of a permanent injunction is granted.

In accordance with the foregoing, the Court hereby **ORDERS AND ADJUDGES** that:

1. AMEX is entitled to an unsecured claim in the amount of $1,974,075.67.
2. To the extent that any of the Debtor's books or records come into the possession of the Defendants, they must be turned over to the Trustee.
3. The Trustee's request for a Permanent Injunction is granted.
4. In accordance with Bankruptcy Rule 9021, a separate final judgment will be entered simultaneously herewith.