## In re REMINGTON AUTOMOBILE & MOTOR CO.

(District Court, N. D. New York. July 29, 1905.)

### No. 1,232.

1. CORPORATIONS—COLLECTION OF UNPAID STOCK SUBSCRIPTIONS.

An agreement between a corporation and a person to whom it issues stock that only a certain per cent. of its par value shall be paid therefor, and that no more shall be called for or paid, is in fraud of creditors of the corporation, and may be set aside, and an assessment made upon the holders of the stock for the difference between the amount paid and its par value by a court of bankruptcy on application by the trustee in bankruptcy of the corporation.

2. SAME—NEW JERSEY STATUTE.

Under the corporation law of New Jersey (Laws 1896, c. 185, pp. 284, 293, §§ 21, 49), which provides that stockholders who have not paid full par value for their stock shall be liable for the remainder or so much thereof as may be necessary to pay the debts of the corporation, but which permits the issuance of stock in payment for property necessary to the business of the corporation, on the bankruptcy of a corporation stockholders who purchased their stock for less than par or received it in payment for property at an agreed price which was less than par may be assessed for the benefit of creditors by the court of bankruptcy for the difference between the amount paid or agreed upon and the par value of the stock held by them, notwithstanding the facts that the stock purported to be full paid and nonassessable, that the transactions were in good faith, and that the money or property paid was of greater actual value than the stock.

3. SAME—PAYMENT IN PROPERTY.

The corporation law of New Jersey (Laws 1896, c. 185, p. 293, § 49) provides that a corporation may issue full-paid stock in payment for property necessary in its business, and that, in the absence of fraud, the judgment of the directors as to the value of the property shall be conclusive. A manufacturing corporation organized under such statute made a contract with the board of trade of a city by which the latter agreed to purchase a stated number of shares of the company's stock at a price less than par, and also to furnish the company a free site for its buildings. Certificates of stock purporting to be full paid were issued to the board of trade, which sold the same to subscribers at the same price which it paid on the strength of circulars setting out the contract and the advantages to the city of the location of the factory. It also procured and conveyed to the company a site which was accepted in fulfillment of the contract. Held, that the site must be regarded as having been conveyed and received in full payment of the difference between the selling price and par value of the stock, and that neither the board of trade nor purchasers from it were liable to further assessments thereon in favor of creditors of the corporation after its bankruptcy.

In Bankruptcy. This is a proceeding to levy an assessment and call in all shares of stock of the above-named bankrupt corporation, Remington Automobile & Motor Company, which have been issued

at less than their par value, or on which the full par value has not heretofore been paid.

See 119 Fed. 441.

Geo. E. Dennison, for trustee.
F. G. Fincke, for Consolidated Water Co.
Charles H. Searle, for certain defendants.
Fuller & Miller, for certain defendants.
Matteson, Deangelis & Coxe, for Celia Algace.

RAY, District Judge.   For about one year prior to August, 1900, S. C. Burch, P. H. Stubblebein, William A. Schmidt, Philo Remington, George H. Stone, and James S. Holmes, Jr., were copartners in business at Ilion, N. Y., and were conducting such business under the name of "Ilion Motor and Vehicle Company."   August 3, 1900, the Remington Automobile & Motor Company, above-named bankrupt, was duly incorporated under and pursuant to the provisions of an act of the Legislature of the state of New Jersey entitled "An act concerning corporations (Revision of 1896)," approved April 21, 1896.   It had its principal office in New Jersey, at No. 252 Maine street, city of Orange, in that state, but it had in fact its principal place of business first at Ilion, N. Y., and then at Utica, N. Y.   The certificate of incorporation says:

"The objects for which this corporation is formed are to manufacture and sell gasoline, steam, electric and other motors, * * * have power to conduct its business in all its branches, * * * and ultimately to hold, purchase, mortgage, sell and convey real and personal property outside of the state of New Jersey * * * and especially in the state of New York. * * * The total authorized capital stock of this corporation is two hundred and fifty thousand dollars ($250,000.00) divided into twenty-five hundred (2,500) shares of the par value of one hundred ($100.00) dollars each."

Philo E. Remington, Charles B. Storrs, and William A. Lord were the original incorporators.   August 6, 1900, these incorporators, waiving all formality and notice, designated a time and place of meeting of the directors, and one was held that day, at which Philo E. Remington was chosen president, S. C. Burch treasurer, and P. A. Stubblebein secretary.   The making of a certificate to enable the company to do business in New York was authorized; also the issuing of stock to the full amount of $250,000.   Resolutions were also adopted to purchase all the property, etc., of the Ilion Motor & Vehicle Company for $52,000, to be paid for with that amount of the capital stock of the company issued at par.   It was also resolved that the office of the company outside of the state of New Jersey should be at Ilion, in the state of New York, and that meetings of the board of directors might be held outside of the state of New Jersey.   By-laws were also adopted.   The property, patent rights, machinery, stock, and other assets of said Ilion Motor & Vehicle Company were not worth the sum of $52,000, or the sum of $5,000, but, whatever such property or its value was, it, and all of it, was turned over to the said Remington Automobile & Motor Company, and its officers duly authorized thereto issued and delivered such 520 shares of the stock of such company in return therefor, marked

"Full Paid Stock." Sixty-five shares of the capital stock of said corporation was also issued and delivered to Philo E. Remington as consideration for the use of his name in the said corporation. The stock in question here and sought to be assessed may be divided into "Ilion Stock," the "Quick Stock," the "Advertising Stock," the "Chamber of Commerce Stock," and "Miscellaneous Sales Stock."

The facts in regard to the Ilion stock are substantially as follows: September 11, 1900, the board of directors adopted the following resolution:

"That for the purpose of securing a local interest in the Remington Automobile and Motor Company on the part of the citizens of Ilion that two hundred (200) shares of stock be issued to be sold at twenty-five dollars ($25.00) per share, and that the proceeds of such sale be placed in the treasury to be used for regular expenses."

At the same meeting the manager was directed to take necessary steps for locating (the corporation) in Ilion permanently, etc. Measures were taken by the citizens of Ilion generally to secure the location of the company at that place permanently. As an inducement to the manager to sell this stock at $25 per share to the citizens of Ilion, he was to be paid extra compensation if he sold to them 100 shares. Subscription papers to raise money to purchase a site for the company were circulated, and considerable sums subscribed. It was discovered that the company was also negotiating with Herkimer and Utica for the purpose of locating there. The subscription papers were called in. About this time the resolution to sell stock at $25 per share to the citizens of Ilion was rescinded, but not until what is known as the Ilion stock had been sold and paid for at $25 per share. The evidence is sufficient to sustain a finding, and I find that all of the purchasers of the Ilion stock took it with the understanding and expectation that the company would locate there permanently, that they would not have taken the stock but for that expectation, and that the said action of the directors caused them so to believe. When this stock was purchased by these Ilion subscribers, it was substantially worthless. It was not worth what the subscribers or purchasers of same actually paid. But they took it directly from the company at $25 per share, knowing its par value was $100 per share. There was no other contract between them and the company. There was no agreement by which the purchasers of this stock, with other citizens who might become purchasers, were to be permitted to pay the balance, or $75 per share, by purchasing and giving to the company a site. I do not doubt that the equities are all with the owners of this stock as between them and the company.

The facts in regard to the Quick stock are as follows: The Quick Manufacturing Company was a corporation of the state of New Jersey. On the 1st day of October, 1900, the directors of the Quick Manufacturing Company adopted the following resolution:

"Resolved, that the president, F. A. Phelps, Jr., and the treasurer, E. M. Rodrock, be and they hereby are authorized and empowered to execute, acknowledge and deliver to the Remington Automobile and Motor Company, a corporation of said state, a proper bill or bills of sale transferring to said

Remington Automobile and Motor Company all of the rights, assets, plant, supplies, patents and property of every kind and description, including good will, etc., of the said Quick Manufacturing Company, in consideration of six thousand ($6,000) dollars of the capital stock of said Remington Automobile and Motor Company, and the assumption by said Remington Automobile and Motor Company of the outstanding liabilities of the said Quick Manufacturing Company, amounting to five hundred and twenty-nine dollars and one cent ($529.01)."

On the 2d day of October, 1900, the board of directors of the Remington Automobile & Motor Company passed the following resolutions, viz.:

"Resolved, that this company do purchase of the Quick Manufacturing Company, a corporation of the state of New Jersey, all its rights, assets, plant, material supplies, patents and property of every kind and description including good will, etc., and that it pay in consideration thereof the sum of six thousand ($6,000) dollars of the capital stock of this company, said stock to be taken in part payment of the purchase price, at the rate of seventy-five ($75.00) dollars per share, and said stock to be issued as full-paid nonassessable stock for the purchase of the property aforesaid and to be designated as stock issued for property purchased.

"Further resolved that this company assume the outstanding liabilities of the said Quick Manufacturing Company, which amount, according to the certificate of the treasurer thereof, to five hundred and twenty-nine dollars and one cent ($529.01), and that it pay to the several creditors of said Quick Manufacturing Company the sums of money due to said creditors by its own checks and take due receipts therefor.

"Further resolved that this company also assume the lease of said Quick Manufacturing Company on its property, 3 and 5 Oliver street, in the city of Newark, Essex county, New Jersey, which said lease is to run to the first day of May, 1901, and the rent to be at the rate of thirty-one dollars and twenty-five cents ($31.25) monthly; which resolution was after discussion adopted."

Thereupon the Quick Manufacturing Company executed and delivered a bill of sale of said property and delivered such property, and received $8,000 of the capital stock of the Remington Company in payment. This stock was divided between the stockholders of the Quick Company. This bill of sale described the property, and recited as the consideration "for and in consideration of the sum of five hundred dollars and other good and valuable considerations." The property received was worth as much as the stock issued and delivered in return therefor.

The facts in relation to the advertising stock are as follows: At a meeting of the board of directors held February 11, 1901, at least eight resolutions were adopted, which provided for the issue of stock in consideration for advertising "upon the basis of seventy-five dollars ($75) per share." Each resolution gave the name of the person to whom the stock was to issue and the number of shares. The stock was issued accordingly. I find that advertising done was worth as much or more than the stock issued and delivered.

The Utica Chamber of Commerce, of Utica, N. Y., was incorporated September 2, 1896, with a large membership, by-laws, and officers duly elected. Its general object and business was and is to promote the business, growth, and prosperity of the city of Utica. Early in 1901 the Remington Automobile & Motor Company entered into negotiations with it with a view of transferring its business to and

139 F.—49

locating permanently in the city of Utica. It adopted a resolution at a special meeting held February 1, 1901, as follows:

"A special meeting of the board of directors was held at the office of the company and the following resolutions were adopted:

"That an option be given to the Utica Chamber of Commerce until February twenty-third for the securing of the permanent location of this company in the city of Utica, upon condition that they supply us with thirty thousand dollars ($30,000.00) in cash through the sale of our stock at $30.00 per share, and upon further condition that they supply us with a factory site of from three to four acres to our satisfaction, the same to be deeded to the company free and clear of all incumbrances.

"The above conditions being complied with, one thousand (1,000) shares of our capital stock is to be issued in the name of whoever the Utica Chamber of Commerce specifies at $30.00 per share, each share full paid and nonassessable."

On the same day an agreement was executed between the Remington Automobile and Motor Company and the Utica Chamber of Commerce, as follows:

"Utica, N. Y. Feb. 11, 1901.

"Remington Automobile & Motor Co., James S. Holmes, Manager, Ilion, N. Y.—My dear Sir: The Utica Chamber of Commerce will obtain a free site of from three to four acres adjoining a railroad switch, and if possible on the canal, and also endeavor to raise $30,000 for the Remington Automobile & Motor Company on the following conditions:

"First. That the facts mentioned in a circular letter submitted to J. S. Holmes, Jr., and to be signed by the directors of the Utica Chamber of Commerce, are correct, the principal points of which are that the Company will come to Utica with debts not to exceed approximately $1,500, $1,000 of which is to be extinguished by taking stock at $30 per share; that it will erect a building at a cost of approximately $5,000, buy additional machinery and equip itself to deliver automobiles. That in addition thereto the Company will have the service of James S. Holmes, Jr., as manager, at a salary of $1,500 a year until the Company is well on its feet; that it will also have the services of William A. Schmidt at a salary of not to exceed $1,500 per annum, and car fare expenses Ilion to Utica, until the Company is well on its feet, and that James S. Holmes, Jr., is to give his full time and attention to the management of the Company. Further that the treasurership, if desired, shall be at the disposal of a Utica man and the resignation of at least three directors, (if it be thought advisable,) shall be obtained and their places taken by Utica men if the best interests of the Company require. Further that the Utica Chamber of Commerce is hereby granted an option until the 23rd day of February to sell and deliver 1,000 shares of the treasury stock of the Remington Automobile & Motor Company at $30 per share. The proceeds to be placed in the treasury of the Company for the development of the business and the location of the plant in Utica.

"And I remain,

"Very truly yours,                          Utica Chamber of Commerce,

"By Carel Humphrey, Secretary.

"We, the undersigned, the Remington Automobile & Motor Company, James S. Holmes, Jr., and William A. Schmidt, each for himself and for and in consideration of one dollar to each of us in hand paid by the Utica Chamber of Commerce, hereby consent and agree to the terms in the above letter.

"Ilion, February 11, 1901.          Remington Automobile & Motor Co.

"By James S. Holmes, Jr. Secy.

"James S. Holmes, Jr.,

"Wm. A. Schmidt.

"It is hereby mutually understood and agreed that the foregoing proposition be and the same is hereby modified in the following particulars:

"That the option therein granted to the Utica Chamber of Commerce be extended to April 25th, 1901, for the purpose of enabling them to collect the

first installment on subscriptions to the stock of the Remington Automobile & Motor Company.

"That the number of the shares of the Treasury Stock of the Remington Automobile & Motor Company which may be taken by the Chamber of Commerce shall be one thousand (1,000) shares, but the Remington Automobile & Motor Company agrees to permanently locate in the City of Utica upon the sale by the Chamber of Commerce of five hundred (500) shares, which the Utica Chamber of Commerce agrees to do.

"That the said Company comes to Utica with debts approximating $2,500.00, one thousand dollars ($1,000) of which is to be extinguished by taking stock at thirty dollars ($30.00) per share.

"That the said Company is not bounden to secure the services of William A. Schmidt.

"That upon the due performance of the terms of said agreed proposition by the said Chamber of Commerce, said Company agrees after erecting said factory building to give daily employment to, at least, an average of twenty-five (25) men for a period of, at least, five years.

"Dated and signed this tenth day of April, 1901.
"Utica Chamber of Commerce,
"George I. Dana, President.
"Remington Automobile & Motor Co.
"By James S. Holmes, Jr. Secy."

It will be noted that the agreement of February 11th was modified April 10, 1901, by the agreement above set forth. The board of trade then put out circulars, which stated, amongst other things:

"The directors of the Utica Chamber of Commerce, after a careful investigation, have entered into a contract with the Remington Automobile and Motor Company to permanently locate in the City of Utica, and bring with them in the executive management of their company James S. Holmes, Jr., and in their shop management William A. Schmidt on condition that the citizens of Utica raise $30,000 cash, all to go to the treasury of the company for the development of the business, the money being obtained through the sale of 1,000 shares of the treasury stock at $30 per share. Each share to be full paid and nonassessable."

At the time this circular was issued Philo E. Remington was president, S. C. Burch treasurer, and James S. Holmes, Jr., secretary and general manager. This circular contained many statements as to the history and assets of the company and the purposes for which it was proposed to expend the $30,000 to be derived from the sale of the 1,000 shares at $30 per share "full paid and nonassessable." This last was stated as follows:

"The Remington Automobile and Motor Company desire to obtain a free site, of between three and four acres, on a railroad switch, and erect thereon a one story building, which is to be of brick and iron construction, 60 feet wide and 180 feet long, similar to the General Electric Company construction at Schenectady. It is estimated that this building will cost $5,000, the plans for which are already prepared and rough estimates made. In this building will be placed the machinery which the company already has in its temporary factory at Ilion, and about $5,000 of additional machinery will be purchased. The total machinery being able to produce four complete motors per day, and the balance of the building used so that four complete automobiles can be delivered per day, giving a maximum capacity to the plant of 1,200 complete automobiles per annum. These will be sold at approximately $850 each, cash on delivery as is the present custom of the business. Twenty per cent. of the selling price to be allowed to the agents, and the present gross cost is estimated at $400 per carriage. On the above basis the company will have $20,000 of working capital to conduct its business and have 799 shares of treasury stock for future development."

Attention was called to the "advantages of the industry to Utica" in the following language:

"Utica needs industries employing men. The Remington Automobile and Motor Company will employ from the start at least fifty men, and it is in a line of business which should permit a very large development and the gradual disbursement of a continually increasing pay roll."

As to "assets of the company" the circular stated:

"The Remington Automobile and Motor Company absorbed by purchase the Phelps motor, owned by the Quick Manufacturing Company, of Newark, N. J., which was the result of two years of experimental development, and cost, to reach its present perfection, about $6,000. Of the twelve Phelps motors built, those in operation are reported as comparing most favorably with the De Dion motor, which is of French construction, and the best gasoline motor on the market. The company also possesses the Schmidt motor, which is still in an experimental condition, with every possibility of its being successfully developed. The condition of the automobile market to-day does not require protection by patents any more than the bicycle business did at its inception.

"Under these conditions the commercial success comes to those first in the field, who develop through the experience gained from the use of their machines by the public.

"The motors in process, carriages being built, patterns, drawings and machinery in the temporary plant at Ilion are roughly worth 5,000 dollars."

From the evidence it is evident that the Utica Board of Trade was deceived by the officers of the company as to the assets and condition of the company. Nevertheless the agreement was made, and thereafter subscriptions were taken by Mr. Humphrey, secretary of the chamber of commerce, and by James S. Holmes, Jr., secretary of the Remington Company. These subscriptions were mostly, if not wholly, made by a letter (the blanks being filled by the subscriber) of which the following is a sample, viz.:

"Subscription Letter.
"Remington Automobile and Motor Company.
"1,000 Shares Treasury stock at $30 per share.
"Utica Chamber of Commerce, Carel Humphrey, Secretary—Dear Sir: I hereby subscribe for five shares of the Remington Automobile and Motor Company, at $30 per share, according to the term of a circular issued by you, dated February 13, 1901, and its modifications, and engage to accept said stock, or any less number of shares that you may allot to me in case of oversubscription, and to pay for the same in conformity with the circular.

"Yours very truly, Geo. H. Torney, Jr.,
"Address, State Hospital, Utica, N. Y.
"Dated, March 25, 1901."

An additional subscription was made, viz.:

We, the undersigned, being Utica Stock-holders of the Remington Automobile & Motor Company, agree to subscribe for additional shares of such company to the amount set opposite our respective names, with the express understanding that payments are to be made by us, twenty per cent. (20%) on or before the fifth day of each month, commencing the 5th day of November. The certificates of stock to be issued upon the basis of thirty dollars ($30.00) per share, and to be full paid, non-assessable, and to apply on account of the block of stock allotted for sale to the Utica Chamber of Commerce.

| | |
|---|---|
| O. S. Foster | 20 |
| Wm. J. Foster | 10 |
| John B. Wild | 10 |
| G. A. Spalding | 25 |
| John L. Mahr | 5 |
| T. R. Proctor | 10 |

I find that the subscriptions to this "Chamber of Commerce stock" were made by each subscriber on the strength of the statements of the circular and on statements made in corroboration by those taking the subscriptions, with the expectation and belief that the 70 per cent. was to be paid and would be paid by the Utica Board of Trade procuring and transferring to said company a site in Utica such as is described in the resolutions, etc., quoted and referred to. The stock was not issued direct by the Remington Automobile & Motor Company to the subscribers, but was issued in blank, and delivered to the Utica Trust & Deposit Company, which received payments and delivered the stock. The company moved to Utica, and was doing some business on leased premises. About 554 shares were subscribed for at $30 per share, and of these about 539 were taken. The other 80 shares mentioned were taken at $50 per share; also some other shares on same terms, making about 96 in all. Forty more shares at $50 per share were issued to certain parties at $50 per share. The evidence shows that the chamber of commerce did its best to comply with the agreement. It, by agents and its officers, spent much time in its efforts to secure a proper site. The agreement, it will be noted, was so changed that only 500 shares of stock were to be disposed of. Only one acceptable site was found, and that could not be obtained by reason of difficulties as to title. Subsequently a site was found which the company agreed to accept and did accept, and which the chamber of commerce purchased and paid for and turned over to the company. The company duly accepted it as a compliance with the agreement in connection with other good and valuable considerations, $1,000 cash, duly paid. No value was fixed on the property to be obtained and turned over to the company by the board of trade, unless it was the difference between the par value of the 500 shares of stock, $50,000, and the $30,000 paid in in cash by the subscribers, or $20,000; and, as the company finally accepted what was offered and $1,000 cash, and released the board of trade, that transaction would seem to have been satisfactorily closed. This was done pursuant to resolutions duly adopted, and the satisfaction executed pursuant thereto reads as follows:

"This is to certify that the Remington Automobile & Motor Company has received from The Utica Chamber of Commerce, the sum of one thousand dollars ($1,000.00) in cash in full satisfaction of the agreement of said Chamber of Commerce, dated February 11th, 1901, to furnish a site for the Remington Automobile & Motor Company, in the City of Utica, and of the modification of said agreement dated April 10th, 1901; and in full satisfaction of all claims against said Chamber of Commerce.

"Remington Automobile & Motor Co.,
"Philo E. Remington, Prest.

"Utica, N. Y., May 22nd, 1902.
"Attest
"James S. Holmes, Jr., Secy."

I find and hold that all the so-called "Chamber of Commerce stock," including that sold and issued at $50 per share on the subscriptions when the subscribers placed themselves within the terms of the circular and the agreement therein mentioned, was

issued and delivered to the various subscribers therefor by the Utica Board of Trade in pursuance of its contract and agreement with the Remington Automobile & Motor Company to sell same or procure its sale and pay over to said company the $30 per share (and $50 per share as to some, by implication), and procure for it a site as mentioned; that the 70 per cent. of the par value of such stock not paid by the subscribers to said board of trade and by it to the company (50 per cent. as to some of same) was to be paid for by the site before mentioned, which, or its equivalent, was subsequently furnished; and that under the terms and spirit of the agreement and understanding between the Remington Company and board of trade and both said parties and the said subscribers to such stock all such stock was paid for in full in cash and property which the Remington Automobile & Motor Company agreed to accept and did accept in full payment therefor. I also find that the cash and property procured by the board of trade and turned over to said company for such stock was of greater value than the stock itself. I find that as to such stock there was no privity of contract between the subscribers and such company. I also find that the property procured and turned over to the company by the board of trade was necessary to its business. The said stock was issued as full-paid stock, and so stated on its face. There is an utter absence of any fraud on the part of the Utica Board of Trade in the transaction, and no fraud on the part of any subscriber or taker of any share of such stock. The Utica Board of Trade put out the circular referred to and quoted from in perfect innocence and good faith, and in the full belief that every statement therein was true. The takers of the stock we are now considering took it relying on those representations and on the further understanding that they were taking it from the Utica Board of Trade, which board was to pay or had paid what they, the subscribers, respectively did not. No one of them had any idea he or she was contracting, agreeing, or becoming liable to pay anything more on the stock, and the officers of the Remington Company had no such idea. It is not necessary here to consider the complication as to legal and equitable rights that would have arisen had the board of trade failed to comply with its agreement, but probably it would have been liable for the seventy per cent.

The liability of these stockholders to the trustee in bankruptcy for the unpaid amount of their subscription is governed by the statutes of the state of New Jersey, the decisions of the highest courts of that state and of the Supreme Court of the United States, in connection with the charter of the bankrupt corporation. This is too well settled to require a citation of authority. Section 21, c. 185, p. 284, Laws N. J. 1896 (see Dill on Corporations, New Jersey, p. 49), reads:

"Where the whole capital of a corporation shall not have been paid in, and the capital paid shall be insufficient to satisfy its debts and obligations, each stockholder shall be bound to pay on each share held by him the sum necessary to complete the amount of such share, as fixed by the charter of the corporation, or such proportion of that sum as shall be required to satisfy such debts and obligations."

The meaning and legal effect of this is plain enough. When the property of a corporation proves insufficient in value to satisfy its debts and obligations, each stockholder is liable for the amount of his unpaid subscription, or such proportion thereof as may be required or necessary to satisfy the debts of the corporation and the legitimate expenses of winding up its affairs, but no more. Hood v. McNaughton, 54 N. J. Law, 425-427, 24 Atl. 497; Cumberland Lumber Co. v. Clinton Hill Co., 57 N. J. Eq. 627, 42 Atl. 585. The unpaid subscriptions constitute a trust fund for the satisfaction of creditors, and a trustee in bankruptcy may recover for the benefit of the estate. Scovill v. Thayer, 105 U. S. 143, 26 L. Ed. 968. If an agreement has been made between the company issuing the stock and the person to whom issued that only a certain per cent. of the par value shall be paid, and that no more shall be called for or paid, such agreement is in fraud of creditors, and may be set aside. Scovill v. Thayer, supra. The court of bankruptcy may do all this, for it is a court of equity.

Section 48 of the corporation law of New Jersey (same statute before quoted) provides:

"Nothing but money shall be considered as payment of any part of the capital stock of any corporation organized under this act, except as hereinafter provided in case of the purchase of property," etc.

Section 49, p. 293 provides:

"Any corporation formed under this act may purchase mines, manufactories or other property necessary for its business, or the stock of any company or companies owning, mining, manufacturing or producing materials, or other property necessary for its business, and issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be full-paid stock and not liable to any further call, neither shall the holder thereof be liable for any further payment under any of the provisions of this act; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased shall be conclusive; and in all statements and reports of the corporation to be published or filed this stock shall not be stated or reported as being issued for cash paid to the corporation, but shall be reported in this respect according to the fact."

There is no difficulty in understanding these sections of the corporation law of New Jersey as applied to this case. Where there was an agreement, express or implied, as in the case of the Ilion subscribers to this stock, that only $25 per share was to be paid by them, in contemplation of law it is fraudulent and void as to creditors, and may be set aside on application of the trustee in bankruptcy; and, so far as necessary to pay creditors, the $75 unpaid on each share may be collected. The same rule applies as to the stock issued for advertising where it was issued at less than par, and the same as to the Quick stock. I see no escape from this conclusion, however inequitable it may seem as between the Remington Company as a corporation and the Ilion stockholders. There was no pretense that the Quick stock, or the stock issued in that deal, was paid for at its par value in cash or property. Where property is given in payment for stock, and the value is not expressly agreed

upon, or the question of its value left for subsequent determination, the fair implication is that its value is the same as the par value of the stock. Of course, in a proper case evidence might be permitted to show such a gross overvaluation as to show fraud, and hence vitiate the transaction, even in cases where the value of the property was agreed upon. We have no occasion to apply the rule here. We cannot vary the rules laid down where the rights of creditors are involved, because the real value of the stock sold was far less than its par value. In regard to the Chamber of Commerce stock, it was paid for in full in cash and property, and there was no fraud in the transaction. This includes the stock issued to the Consolidated Water Company, and hence I need not consider the question of the power of the officer who took the stock, or of the water company itself to take it.

In Handley v. Stutz, 139 U. S., at page 427, 11 Sup. Ct., at page 534 (35 L. Ed. 227), the court said:

"Ever since the case of Sawyer v. Hoag, 17 Wall. 610, 21 L. Ed. 731, it has been the settled doctrine of this court that the capital stock of an insolvent corporation is a trust fund for the payment of its debts; that the law implies a promise by the original subscribers of stock who did not pay for it in money or other property to pay for the same when called upon by creditors; and that a contract between themselves and the corporation that the stock shall be treated as fully paid and nonassessable, or otherwise limiting their liability therefor, is void as against creditors. The decisions of this court upon this subject have been frequent and uniform, and no relaxation of the general principle has been admitted. Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203; Sanger v. Upton, 91 U. S. 56, 23 L. Ed. 220; Webster v. Upton, 91 U. S. 65, 23 L. Ed. 384; Chubb v. Upton, 95 U. S. 665, 24 L. Ed. 523; Pullman v. Upton, 96 U. S. 328, 24 L. Ed. 818; County of Morgan v. Allen, 103 U. S. 498, 26 L. Ed. 498; Hawkins v. Glenn, 131 U. S. 319, 9 Sup. Ct. 739, 33 L. Ed. 184; Graham v. Railroad Co., 102 U. S. 148, 161, 26 L. Ed. 106; Richardson v. Green, 133 U. S. 30, 10 Sup. Ct. 280, 33 L. Ed. 516."

In that case—Handley v. Stutz—the court decided:

"An active corporation, finding its original capital impaired by loss or misfortune, may, for the purpose of recuperating itself, and of producing new conditions for the successful prosecution of its business, issue new stock, and put it upon the market, and sell it for the best price that can be obtained; and in such case no such trust in favor of a creditor arises against the purchaser who, in good faith, buys for less than par."

But that is not this case. Here we have subscriptions to the original capital stock. Those who took it knew they were giving "currency" standing to the corporation, and as between them and creditors the equities of the latter prevail when there was no pretense of full payment in any way.

Findings of fact and conclusions of law must be prepared in accordance herewith embraced in the order to be signed, and the holders of the stock to be assessed must be carefully specified by name, etc. If any disagreement arises as to the persons within this decision, it may be settled with the order.