**In re FLORIDA BAY TRADING COMPANY, Debtor.**

**Buddy FORD, Chapter 7 Trustee for Florida Bay Trading Company, Plaintiff,**

v.

**Neil Turk FELDMAN, M.D., P.A., Defined Benefit Pension Plan and Neil Turk Feldman, as Trustee of the Neil Turk Feldman, M.D., P.A., Defined Benefit Pension Plan, Defendants.**

**Bankruptcy No. 92–834–8P7.
Adv. No. 92–372.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Oct. 3, 1994.

Buddy D. Ford, Roberta Colton, Tampa, FL, for plaintiff.

Domenic L. Massari, III, Tampa, FL, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case and the Complaint in this Adversary Proceeding was filed by Buddy Ford (Trustee), the original Trustee of the estate, who asserted five claims against Neil Turk Feldman, M.D., P.A., Defined Pension Plan and Neil Turk Feldman, as Trustee of the Neil Turk Feldman, M.D., P.A., Defined Benefit Pension Plan (Feldman Plans).

In Count I the Trustee sought injunctive relief prohibiting Neil Turk Feldman, M.D. (Dr. Feldman), as trustee of the Feldman Plans, from foreclosing, selling or interfering with property of the estate. In Count II the Trustee sought equitable subordination of the claim of the Feldman Plans. In Count III the Trustee sought to recover and invalidate a lien claimed by the Feldman Plans, voidable according to the Trustee as a fraudulent transfer under 11 U.S.C. § 544 (sic). In Count IV the Trustee, relying on § 550 of the Bankruptcy Code, sought to recover from the Feldman Plans exotic reptile skins. In Count V the Trustee sought declaratory relief to determine the nature and extent of the lien.

In due course the Feldman Plans filed a counterclaim which basically incorporated the claims set forth in their Complaint filed in the Civil Circuit Court for Pinellas County, Florida (Case No. 89–018702–12). In that State Court action, the Feldman Plans sought to foreclose their claimed security interest in exotic reptile skins and sought to replevy the same skins' which currently remain in storage. After removal, the suit filed by the Feldman Plans has been consolidated with this adversary proceeding.

## CAST OF CHARACTERS

It should be helpful in order to understand this highly fact intensive background of the several claims under consideration to briefly discuss the characters involved in the saga of 63,082 Tegue lizard skins, which is a shorthand reference to tupinambis teguixin, the official name of an exotic South American reptile, which is the most unique collateral this Court has ever had the opportunity to consider. John Wilson (Mr. Wilson) is a trapper of exotic animals, primarily reptiles, and has been importing exotic reptile skins into the United States since the early 80's.

Neil Turk Feldman, M.D. (Dr. Feldman) is a physician specializing in sleep disorders. He is the trustee and primary beneficiary of two Defined Benefit Pension Plans (Feldman Plans). He exercises absolute dominion and control over both Pension Plans. At all times relevant, he had the sole check writing authority for the Feldman Plans and made all final investment decisions for the Feldman Plans (Plf's Exh. Nos. 29 & 31).

G. Richard Leveritt (Mr. Leveritt) is the accountant for Dr. Feldman and the Feldman Plans.

Florida Bay Trading Company (Debtor or Florida Trading) f/k/a Florida Reptile Trading Company (Debtor) is a Florida corporation originally formed and created in 1985 for the purpose of marketing exotic reptile skins, including the skins of Tegue lizards caught and imported into the United States by Mr. Wilson. Florida Reptile Tanning, Inc. (Florida Tanning) is a related corporation to the Debtor and is also a Debtor in a Chapter 7 case pending before the Honorable Thomas

E. Baynes, Jr., Case No. 89–6764. Both Florida Trading and Florida Tanning were formed by Mr. Wilson. Dr. Feldman, Mr. Wilson and Mr. Leveritt were made directors of Florida Trading at the time of incorporation and eventually became shareholders and officers of the company. After Dr. Feldman's purchase of stock, on October 18, 1985, there is no serious dispute that he controlled the affairs not only of the Debtor but also of Florida Tanning, either through himself or through Mr. Leveritt, his accountant. In fact, when Florida Trading was dissolved by the State of Florida for failure to pay taxes, Dr. Feldman paid the taxes and obtained reinstatement for the purpose of filing the Chapter 7 Petition. Dr. Feldman directed the filing of the Debtor's Chapter 7 Petition and personally paid the required filing fee. The schedules, Statement of Financial Affairs and other required documents filed by the Debtor were signed by Dr. Feldman and Mr. Leveritt.

Rosario A. Musella, M.D. (Dr. Musella) is a colleague of Dr. Feldman and at the time relevant maintained an office in the same complex. Dr. Musella and his wife, Lilli, are co-trustees of the R.A. Musella, M.D. F.A.C.S., P.A., Defined Benefit Pension Plan and Profit Sharing Plan and Trust (Musella Plan).

### THE RELEVANT TRANSACTIONS

The controversy centers around the ownership of Tegue lizard skins and the validity and extent of the lien claimed by Dr. Feldman and/or the Feldman Plans. The underlying transactions which form the basis for the claims of the Trustee are complicated and require a detailed recitation of the facts and an analysis of the claims.

There were basically two transactions involved concerning the controversy under consideration. In 1982 Mr. Wilson had an inventory of 221,000 lizard skins stored in Paraguay. Because of complications that developed concerning the importation of reptile skins due to an international treaty dealing with endangered species, it appeared that he would no longer be permitted to import the lizard skins into the United States. Notwithstanding, he was successful. When the skins

arrived in the United States they were untanned and, of course, could not be marketed until tanned. Mr. Wilson contacted Dr. Feldman who was interested in investing in a joint venture with Mr. Wilson after having received a glowing, optimistic projection by Mr. Wilson of the great potential for profit from marketing the skins after they had been tanned. Mr. Wilson and Dr. Feldman entered into a Joint Venture Agreement on September 9, 1985 (Plf's Exh. No. 1). Pursuant to the Agreement, Dr. Feldman agreed to "advance" to Mr. Wilson the sum of $47,312 (Plf's Exh. No. 1A). Paragraph (D) of the Agreement provided that Mr. Wilson would guaranty to repay in full the sums advanced by Dr. Feldman and he will receive a minimum return of 50% or a total of $62,082. This paragraph also attempted to clarify that the advance was intended not as a loan but a capital contribution to a joint venture. Despite that attempt the transaction was evidenced by a promissory note executed by Mr. Wilson (Plf's Exh. No. 1, Exhibit "B"). The Agreement provided that it is to terminate within 180 days from the date of the Agreement. Dr. Feldman assigned his interest in the joint venture to the Feldman Plans. On October 4, 1985, the Feldman Plans assigned one-third interest in this Agreement to the Musella Plan (Plf's Exh. No. 2).

On November 1, 1985, Mr. Wilson formed a corporation originally under the name of Florida Reptile Trading Company, whose name was later changed to Florida Bay Trading Company. The corporation was not capitalized upon formation and was inactive. The only asset of the corporation was 63,082 Tegue lizard skins contributed by Mr. Wilson on February 12, 1986 (Plf's Exh. No. 18), the very skins which were originally to be tanned pursuant to the Joint Venture discussed earlier.

The next transaction involves a Stock Purchase Agreement dated October 18, 1985, whereby Dr. Feldman acquired 50% ownership interest in Florida Tanning (Plf's Exh. No. 8). By an Amendment dated February 12, 1986, Mr. Wilson also agreed to sell Dr. Feldman a 50% ownership in the Debtor (Plf's Exh. No. 9). There is no evidence in

this record that any consideration was given for this stock acquisition by Dr. Feldman. Dr. Feldman ultimately gave, out of his 50% interest in the Debtor, 15% to Mr. Leveritt.

On the same date, October 18, 1985, Dr. Feldman loaned Florida Tanning $60,000 evidenced by a promissory note signed by Mr. Wilson with a stated maturity date of April 18, 1986 (Plf's Exh. No. 4). The note was secured by a pledge of all the machinery owned by Florida Tanning, and the 63,082 Tegue lizard skins (Plf's Exh. No. 3 and No. 6). The security was perfected by a UCC–1 filed with the State of Florida on October 28, 1985 (Def's Exh. No. 14).

## THE MUSELLA LOAN TRANSACTION

In early 1986 Dr. and Mrs. Musella, as Co-Trustees, loaned $138,000 to the Debtor on behalf of the Musella Plans. To evidence this transaction, Mr. Wilson executed a promissory note on behalf of the Debtor (Plf's Exh. No. 10). The note was guaranteed by Mr. Wilson, Dr. Feldman and Mr. Leveritt (Plf's Exh. No. 12). The loan was granted and as part of this transaction the Debtor executed a promissory note in that amount in favor of the Musella Plan. A chattel mortgage (Security Agreement) (Plf's Exh. No. 11) and a UCC–1 financing statement (Def. Exh. # 19) document the security interest granted to the Musella Plan (Plf's Exh. Nos. 10 & 11). The UCC–1 was recorded locally in the Circuit Court of Hillsborough County and in the Office of the Secretary of State in Tallahassee, Florida. The collateral described in the Security Agreement made reference to an exhibit which merely set forth lot numbers, pack numbers, tanner identification numbers, the number of skins as the collateral without identifying whether or not the skins were Tegue lizard skins or some other type of reptile skins. The Security Agreement was signed by Mr. Wilson as president of Florida Bay Trading Company, f/k/a Florida Reptile Trading Company. It is without dispute that none of the loan proceeds were deposited in the Debtor's bank account but were deposited in the bank account of Florida Tanning. Although it is intimated that there was actually a loan by the Debtor to Florida Tanning, the alleged loan is not documented and clearly there was no consideration for any such loan. It is also interesting to note that the proof of claim filed on behalf of the Debtor in the Chapter 7 case of Florida Tanning made no reference to any such intercompany loan (Plf's Exh. No. 35).

The proceeds from the Musella loan were disbursed by Florida Tanning as follows: $63,082 was paid to Dr. Feldman and Dr. Musella in full satisfaction of their interest in the joint venture. $62,186.30 was used to repay the money loaned by Dr. Feldman to Florida Tanning. It is to be noted that this note was repaid on February 28, 1986, before its maturity date of April 18, 1986 (Plf's Exh. No. 23). The remaining $12,731.70, less attorneys fees, was deposited in the bank account of Florida Tanning.

On November 7, 1987 the original $138,000 loan by the Musella Plan became due, Dr. Musella refused to extend the maturity date but insisted on a roll-over and execution of a new note. In fact there was a new promissory note executed on November 1, 1987 (Plf's Exh. No. 18), in the amount of $188,000, $50,000 more than was due under the original promissory note. There is no evidence in this record that an additional $50,000 was loaned by the Musella Plan to the Debtor. However, it appears that the Musella Plan loaned the $50,000 to Florida Tanning (Plf's Exh. No. 14). It should be noted that the original promissory note of the Debtor executed in the amount of $138,000 was never cancelled or destroyed and in fact it purports to be the basis of the counterclaim to foreclose and to replevy filed by the Feldman Plans.

On or about November 2, 1988 the Musella Plan called the $188,000 note. Since Dr. Feldman was one of the guarantors of this note he paid it off. In return Dr. Musella assigned all rights of the Musella Plan to Dr. Feldman individually which included; the original $138,000 promissory note, an alleged $50,000 Florida Tanning promissory note dated June 26, 1987, the remaining personal guarantees of Mr. Wilson and Mr. Leveritt, and the Chattel Mortgage/Security Agreement which purported to evidence a lien claimed on the Tegue lizard skins (Plf's Exh.

No. 14). The assignment, of course, did not include Dr. Feldman's personal guaranty which was presumably discharged by his payment of the Musella loan. For some unknown reason, the Assignment (Plf's Exh. No. 14), did not refer to the $188,000 promissory note but instead referred to the original $138,000 note and an alleged $50,000 note, both presumably consolidated into the $188,000 note.

The Feldman Plan filed a lawsuit against the Debtor in the Civil Circuit Court of Pinellas County to foreclose the chattel mortgage, to replevy the Tegue lizard skins and to reform the assignment of the Musella Plan loan. The Feldman Plan maintained that the assignment was intended to be in favor of the Feldman Plan, and not Dr. Feldman individually, because the funds paid to the Musella Plan were paid by the Feldman Plan. A default was taken by the Feldman Plan against the Debtor and a Judgment of Reformation was entered in favor of the Feldman Plan. At the time of the default, the Debtor was no longer active, had in fact been dissolved for failure to pay the corporate taxes required, and Dr. Feldman acted as a surviving director and trustee of the Debtor. The default against the Debtor eventually was set aside by the Civil Circuit Court of Pinellas County on May 21, 1993. As noted earlier, this action has been removed to this Court and is currently consolidated with the Trustee's adversary proceeding.

These are basically the facts relevant to the claims asserted by the Trustee based on which it is the Trustee's contention that he is entitled to the relief he seeks determining that the claim of Dr. Feldman and/or the Feldman Plans should be subordinated pursuant to § 510(c) of the Bankruptcy Code to the claims of creditors (Claim II); an order to set aside the lien claimed by the Feldman Plans on the Tegue lizard skins on the basis that the fixing of the lien was a fraudulent transfer pursuant to Fla.Stat. § 726.01 (Claim III); and, to recover the transfers which are avoided pursuant to § 550 (Claim IV) and the corresponding relief which sought a determination of the nature and extent of the lien claimed by the Feldman Plans (Claim V).

The claims asserted by the Feldman Plans by way of a counterclaim are basically the flip side of the same coin. In Count I the Feldman Plans seek leave for authority to foreclose its lien and the claim in Count II seeks authority to replevy the same personal property. Although as noted earlier Dr. Feldman directly or through the Feldman Plans has been involved with Mr. Wilson and the two corporations, Florida Bay Trading and Florida Reptile Tanning, these transactions, particularly the initial so-called joint venture and the handling of the Musella loan are relevant only to the Trustee's claim to subordinate the claim of Dr. Feldman and/or the Feldman Plans against the Debtor pursuant to § 510(c)(2) of the Bankruptcy Code.

The claims in Counts III, IV and V all relate to the alleged invalidity of the security agreement claimed by Dr. Feldman. The claim in Count II is based on § 510(c)(2) pursuant to which the Trustee seeks to subordinate the claim of Dr. Feldman based on equitable grounds.

## VALIDITY OF THE SECURITY AGREEMENT

Obviously the initial inquiry should be addressed to the validity, vel non, of the Security Agreement executed on February 18, 1986 in favor of Rosario A. Musella, M.D. F.A.C.S. and Lilli Musella, Co-trustees of the R.A. Musella, M.D. F.A.C.S., P.A., Defined Benefit Pension Plan and Profit Sharing Plan and Trust (Musella Plan). This is the Security Agreement which is the basis of the security interest claimed by Dr. Feldman under the multi-pronged attack by the Trustee.

## ENFORCEABILITY OF THE SECURITY INTEREST

The enforceability of security interests under Article IX, Chapter 679.101 et seq. of the Uniform Commercial Code (UCC) as adopted in this state is governed by Fla.Stat. § 679.203(1)(b). This Section provides that a security agreement is not enforceable against the debtor or third parties unless (1) value has been given and (2) the Debtor has right in the collateral.

■ This record leaves no doubt that both requirements of § 679.203(1)(b) have been met. The Musella Plan did lend $138,000 to the to the Debtor. The fact that none of the loan proceeds ended up with the Debtor is, of course, without significance as it relates to the enforceability of the security agreement. It is equally clear from this record that at the time the security agreement was executed, the Tegue lizard skins were owned by the Debtor.

It is the contention of the Trustee that notwithstanding, the Security Agreement is deficient as a matter of law and this defect in turn renders the Security Agreement unenforceable.

The sufficiency of the description of the collateral is governed by Fla.Stat. § 679.110. This Section provides that for the purpose of the Statute any description of personal property is sufficient, whether or not it is specific, as long as it reasonably identifies what is described.

■ In order to properly evaluate the sufficiency of the description for the purpose of determining the enforceability of the security agreement it should be helpful to briefly consider the reason of the Code's requirement for a security agreement and for the requirement that it must be in writing signed by the debtor and the secured party. These formal requisites to enforceability are in the nature of a Statute of Frauds. It is designed to document the intent of the parties concerning the creation of the security interest and to eliminate parol evidence to prove the intent. It is axiomatic that a security agreement executed in compliance with the formal requisites of the Uniform Commercial Code as adopted by this state by Fla.Stat. § 679.203(1)(b) is binding on the parties to the agreement. While it is clear that the security agreement must furnish an adequate description of the collateral pledged, if it is clearly understood by the parties what was pledged as security and the extent of the security interest created such security agreement cannot be challenged by third parties on the basis that the description of the collateral lacks specificity.

■ It is without any doubt in the present instance that all parties to the security agreement, i.e. Dr. Musella, the Musella Plan and Mr. Wilson, knew that the Debtor's one and only asset which was intended to be the collateral were the Tegue lizard skins. After all, Dr. Musella was party to the so-called joint venture agreement between Mr. Wilson and Dr. Feldman initially and ultimately Dr. Musella himself and the very subject of the joint venture was to market and sell the Tegue lizard skins. In sum, this Court is satisfied that the challenge of the Trustee of the security agreement on the basis that the collateral is not adequately described in the security agreement must fall.

### LACK OF PERFECTION

■ A security agreement, with some exception, is not valid and enforceable against third parties unless a financing statement, Form UCC–1, is filed either in the county where the goods are located or with the Office of the Secretary of State depending on the type of goods involved. Unlike the security agreement, a financing statement was not designed to create a security interest but to perfect the interest already attached. *National Ropes, Inc. v. National Diving Service, Inc.,* 513 F.2d 53 (5th Cir. 1975). The purpose of the financing statement is to put third parties on notice that a security interest may exist in certain goods and that the third party may contact the debtor or the secured party to learn the extent of the security interest. *Owen v. McKesson and Robbins Drug Company,* 349 F.Supp. 1327 (aff'd 486 F.2d 1401 (5th Cir. 1973)). The description of the collateral in a financing statement is sufficient if it reasonably informs third parties that the item in possession of the debtor may be subject to a security interest thus putting the parties on notice that further inquiry may be necessary. *American Restaurant Supply Co. v. Wilson,* 371 So.2d 489 (Fla. 1st DCA 1979).

■ In the present instance it is without dispute that the financing statement does not include the descriptive term "Tegue." The collateral described in the schedule merely indicates lot number, pack number, tannery identification number and number of skins.

While it is true that the Tegue lizard skins were physically on the premises occupied by Florida Tanning and it is possible that Florida Tanning had some other skins on the premises, the description was clearly sufficient to enable the searcher to contact the parties to ascertain if the skins which match the schedules on record contained the collateral involved in this controversy. Based on the foregoing, this Court is satisfied that the description of the collateral is sufficient and was validly perfected.

## FRAUDULENT TRANSFER § 544(b) AND FLA.STAT. § 726.105(1)(b)

■ Having concluded that the security agreement under consideration is enforceable and the Financing Statement sufficiently described the collateral, thus the security interest was properly perfected, the next issue involves the Trustee's claim that granting the security interest involved was a fraudulent transfer thus voidable pursuant to § 544(b) of the Bankruptcy Code and Fla.Stat. § 726.105(1)(b).

§ 544(b) provides:

"The Trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of this title...."

Florida Statute § 726.105 Transfers fraudulent as to present and future creditors provides:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whether the creditor's claim arose before or after transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation:

(b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor

(1) was engaged or was about the engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

It is beyond peradventure that the term "transfer" as used in § 544(b) must be interpreted with reference to that term as defined by § 101(54) of the Code which provides that

"transfer means every mode direct or indirect absolute or conditional, voluntary or involuntary of disposing of or parting with property or with an interest in property."

The definition of the term in Fla.Stat. § 726.102(12) is basically the same if not broader. In sum granting a security interest clearly falls within the term of a "transfer" of both Statutes. It is equally clear that § 544(b) is not a special voiding section itself but merely permits the Trustee to borrow a voiding power of an applicable state law from a creditor. Under Fla.Stat. § 726.105(1), the voiding power granted by the statute is available to a creditor, whether the claim of the creditor arose before or after the transfer. This record leaves no doubt that this debtor had creditors before the transfer also creditors whose claim arose after the transfer. This leaves for consideration whether or not this record would support the conclusion that the transfer in question granting the security interest was fraudulent under Fla.Stat. § 726.105(1)(b). It is without serious dispute that at the time the security interest under scrutiny was granted to the Musella Plan the debtor was not actively involved in business. It was, however, clearly about to engage in business, that is to market the Tegue lizard skins as soon as the skins were tanned. Is hardly debatable that the Debtor did not receive a reasonably equivalent value in exchange for the obligation incurred. The fact of the matter is, as pointed out earlier, the Debtor never received any proceeds from the Musella Plan loan. Based on the foregoing this Court is satisfied that the security interest granted to the Musella Plan to secure the repayment of $138,000.00 was a fraudulent transfer within the provision of Fla.Stat. 726.105(1)(b) and voidable by the Trustee pursuant to Sec. 544(b) of the Code.

## EQUITABLE SUBORDINATION § 510(c)(2)

Assuming without conceding that the transfer i.e. the granting the security interest to the Musella Plan was not a voidable transfer, this still leaves for consideration the alternative claim of the Trustee which is

based on Sec. 510(c)(2) of the Bankruptcy Code.

This alternative relief sought by the Trustee, that is to subordinate the claim and the security interest acquired by Dr. Feldman through an assignment from the Musella Plan pursuant to § 510(c) of the Bankruptcy Code which provides:

§ 510. Subordination

(c) . . .

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

### DIFFERENCE BETWEEN SUBORDINATION AND DISALLOWANCE

 Subordination of a claim in bankruptcy differs in several fundamental respects from the disallowance of a claim. Disallowance of a claim is a legal determination that the claim under consideration is not allowable by law. On the other hand, subordination of a claim presupposes that the claim is allowed but for equitable reasons must be subordinated to the other allowed claims. Thus, the subordination relates to the order in which claims have been allowed or are to be paid when the Trustee is paying dividends but does not relate to the validity of the technical legality of a claim. *Liebowitz v. Columbia Packing Co.*, 56 B.R. 222 (D.C.Mass.1985) (aff'd w/o opp.) 802 F.2d 439 (1st Cir.1986).

 It logically follows from the foregoing that while equitable considerations justify to subordinate the particular claim does not mean that it is warranted to disallow the claim. *In re Century Inns, Inc.*, 59 B.R. 507 (Bankr.S.D.Miss.1986). The Court while considering equitable subordination frequently refers to the fact that a corporation against whom a claim was filed and which sought to be subordinated was under capitalized. While this fact, if it is a fact, may be relevant as part of one of the facts would be considered by the Court when a claim is sought to be subordinated it is important initially to determine whether or not the claim asserted in fact represents a binding legal obligation, a debt, or it is merely nothing more than a capital contribution which is an investment thus does not represent a debt but equity. It is clear that if the loan under consideration is found to be a capital contribution there is no debt created at all. However, if the loan under consideration is a genuine, bona fide loan there is an indebtedness which is presumed to be a valid obligation and absent any other factors it is entitled to be allowed. Thus, an entity whose claim is subordinated is still a creditor holding a valid claim and theoretically is permitted to share in the distribution provided there are sufficient funds to satisfy in full all the other allowed claims. *Schwartz v. Mills*, 192 F.2d 727 (2d Cir.1951). As pointed by Judge Learned Hand in *In re V. Loewer's Gambrinus Brewery Co.*, 167 F.2d 318 (2d Cir.1946):

"Both the shareholders and the creditors in any enterprise assume some risk of its failure, but the risks are different. The shareholders stand to lose first, but in return they have all the winnings above the creditors' interest, if the venture is successful; on the other hand, the creditors have only their interest, but they come first in distribution of the assets."

### PRINCIPLES GOVERNING EQUITABLE SUBORDINATION

 § 510(c) adopts a long-standing judicially developed doctrine of equitable subordination. Thus, under appropriate circumstances, the bankruptcy court, pursuant to its equitable powers, always had the authority to subordinate an allowed claim in order to assure that fraud will not prevail, that substance will not give way to form, that technical consideration will not prevent achieving substantial justice. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). While it is true that *Pepper v. Litton* did not involve subordination but a total disallowance of the claim, the Court seized upon a doctrine announced in an old case of *Twin–*

*Lick Oil Co. v. Marbury,* 91 U.S. (1 Otto) 587, 23 L.Ed. 328 (1875), where the Court held that "equities of the case," "unfairness," "arms-length bargain," "rules of fair play and justice" are factors which should be considered when subordination of a claim sought. Despite the praiseworthy and deserving goal the equitable subordination seeks to achieve it is also recognized that it is an unusual and extraordinary remedy and should not be applied lightly and only in limited circumstances. *In re CTS Truss, Inc.,* 868 F.2d 146 (5th Cir.1989). It is also appropriate to note that the doctrine is remedial and not penal and should be applied only to the extent it is necessary to prevent the specific harm that creditors have suffered as the result of the conduct which would warrant application of the doctrine. *In re Westgate–California Corp.,* 642 F.2d 1174 (9th Cir.1981). The concept of equitable subordination, as developed by case law, is that a claim may normally be subordinated only if its holder is guilty of misconduct. *Benjamin v. Diamond (In the Matter of Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977). In *Mobile Steel,* the Court of Appeals for the Fifth Circuit proposed three conditions, arrived at through a distillation of case law, that must be satisfied before exercise of the power of equitable subordination is appropriate:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination must not be inconsistent with the provisions of the Bankruptcy Act.

This is the generally accepted test adopted by the majority of courts when applying the doctrine of equitable subordination.

■■■ The relationship of the creditor whose claim is sought to be subordinated with the debtor is an important factor which must be considered before the doctrine is applied. As stated by the Supreme Court in *Richardson v. Green,* 133 U.S. 30, 10 S.Ct. 280, 33 L.Ed. 516 (1890) the courts of equity would regard with a "large measure of watchful care" all transactions by officers, directors, and stockholders with their corporations and unless satisfied by proof that the transaction was entered into in good faith with a view to the benefit of the debtor as well as its creditors and not solely for the benefit of Feldman *Richardson v. Green, supra,* with the view to its own benefit, the court of equity will not lend its aid to the enforcement of the transaction involved. The principle enunciated by the Supreme Court in *Richardson* has been followed consistently by courts including the Court of Appeals of our Circuit in *In re N & D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir. 1986); see also *In re Missionary Baptist Foundation of America, Inc.,* 818 F.2d 1135, 1144 n. 8 (5th Cir.1987).

The Courts are in general agreement with the three prong test developed by the Fifth Circuit in *Matter of Mobile Steel Corp.,* 563 F.2d 692 (5th Cir.1977).

■■■ The fairness of this transaction cannot be evaluated in a vacuum and must be put into a proper context and be considered together with the so-called joint venture agreement initially entered into by Mr. Wilson and Dr. Feldman. There is no question that the joint venture agreement attempted to put an iron-clad label on the transaction in paragraph (d) which provides, inter alia, that the parties acknowledge and agree that this is not a loan by Dr. Feldman but all funds advanced by Dr. Feldman in the nature of capital contribution to the joint venture.

Even a cursory reading of the agreement leaves no doubt that this was a loan for the following reasons:

The agreement provided an absolute obligation of Mr. Wilson to retain the funds advanced by Dr. Feldman, $47,312, together with a guaranteed 50% profit or repay to Dr. Feldman $63,082 on or before 180 days from the date of execution of the agreement. The obligation to repay his personal guarantee by Mr. Wilson which is a total contraindication that the advances were capital contributions but not a loan. Although the joint venture agreement does not specifically provide for Dr. Feldman's right to assign any part of his interest the record is clear that he did in fact assign ⅓ of his interest to Dr. Musella.

■ These are the undisputed facts which occurred prior to February 22, 1986 when the Musella Plan loaned $138,000 to the Debtor. This is a loan which was allegedly secured by the Debtor's interest in the Tegue lizard skins. The promissory note executed by the Debtor in favor of Dr. and Mrs. Musella as co-trustees of the Musella Plan was personally guaranteed by Dr. Feldman, Mr. Wilson and Mr. Leveritt. This record leaves no doubt that the proceeds of the loan were never intended to be made for the benefit of the Debtor and what occurred belies any bona-fide contention that that was the intention of the parties. At the time this transaction was concluded, the Debtor was already indebted to Dr. Feldman in conjunction with the stock purchase in Florida Reptile Tanning, an affiliate but not a Debtor before this Court at this time. Dr. Musella was fully aware in advance of the loan that the funds would be used to repay the so-called equity interest in the joint venture of Dr. Feldman and Dr. Musella and $63,082 out of the $138,000 loaned was immediately paid to Dr. Feldman and Dr. Musella in satisfaction of their guaranteed interest in the joint venture agreement mentioned earlier. The remaining balance was given to Florida Reptile Tanning out of which Dr. Feldman and Mr. Leveritt immediately withdrew an additional $62,186.30 which was to repay the loan made by Dr. Feldman to Florida Reptile Tanning and not to the Debtor, a payment in advance of the due date which did not become due until April 18, 1986. After this payment their remained $12,731.70, less attorneys fees, which was deposited in the bank account of Florida Reptile Tanning and it is clear that this Debtor received not a dime from this loan from the Musella Plan for which it obligated itself by execution of the promissory note. It is interesting to note that Dr. Musella refused to roll over the original note when it became due and insisted on the execution of a new promissory note which was executed on November 1, 1987 but rather than in the amount owed on the original note, it was in the amount of $188,000 (Plf's Exhibit No. 16). There is no contention made here that the Musella Plan advanced any additional funds to the Debtor but it appears that the Musella Plan loaned $50,000 to Florida Reptile Tanning which loan was then incorporated in the new note executed by the Debtor (Plf's Exhibit No. 14). As noted earlier, the original promissory note executed by the Debtor in the amount of $138,000 payable to the Musella Plan was never canceled, marked satisfied or destroyed. The fact of the matter is, it now purports to be the basis of a counterclaim filed by Dr. Feldman in his action to foreclose the claimed lien in the Tegue lizard skins and his action for replevin (Exhibit 8 to Counterclaim).

The claim asserted in this case is a claim asserted by Dr. Feldman. His claim is based on an assignment of all rights and interests the Musella Plan had in the note in the alleged security interest in the Tegue lizard skins and an assignment of the guarantees of Mr. Wilson and Mr. Leveritt (Plf's Exhibit No. 14, Paragraphs (c) and (d)). Obviously the assignment did not cover the assignment of Dr. Feldman's personal guarantee for obvious reasons since this obligation was presumably discharged by the payment. All through this transaction there is hardly any question that Dr. Feldman was a dominant player who called the shots, exacted everything to the max in his favor and none of these transactions had any concerns whatsoever of the Debtor's estate and were not really entered into for the benefit of the Debtor.

Applying the test of *Mobil Oil* this Court is satisfied that the transaction under scrutiny has the hallmarks of gross and glaring inequitable conduct designed to confer an unfair advantage on Dr. Feldman who was without any doubt an insider of the Debtor within the meaning of that term as defined in § 101(31). It is uniformly recognized that transactions between corporate debtors and insiders are closely scrutinized and as stated in *Richardson v. Green, supra* that unless the Court is satisfied that the transaction was entered into in good faith with a view to benefit the Debtor as well as it creditors and not solely to the benefit of the insider. Applying the foregoing principles there is hardly any doubt that while the original loan might be a valid allowable claim against the estate of the Debtor, that is the loan by the

Musella Plan in the amount of $138,000, clearly a claim now asserted by Dr. Feldman is tainted with a sufficient degree that under the principles of equity the claim acquired by the assignment should be subordinated pursuant to § 510(c)(1) and the security interest claimed by Dr. Feldman shall be transferred to the estate pursuant to § 510(c)(2) of the Bankruptcy Code.

A separate final judgment shall be entered in accordance with the foregoing.